THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. KRISTA A. BRANT, Defendant-Appellant.

Second District No. 2—07—0338

Opinion filed September 22, 2009.

Patricia Unsinn and Jessica Wynne Arizo, both of State Appellate Defender's Office, of Chicago, for appellant.

Joseph E. Birkett, State's Attorney, of Wheaton (Lisa Anne Hoffman, Assistant State's Attorney, and Lawrence M. Bauer and Sally A. Swiss, both of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

PRESIDING JUSTICE ZENOFF delivered the opinion of the court:

Following a bench trial on January 12, 2007, defendant, Krista A. Brant, was convicted of criminal trespass to a residence (720 ILCS 5/19—4(a)(2) (West 2006)). On March 7, 2007, the trial court denied defendant's motion for a new trial or a judgment of acquittal and sentenced her to 24 months' probation. Defendant appeals,[1] arguing that the State failed to prove her guilty beyond a reasonable doubt and that the trial court erred in not allowing her attorney to make a closing argument. For the reasons that follow, we affirm.

---

[1]The Office of the State Appellate Defender was appointed to represent defendant. On June 26, 2008, counsel filed a motion to withdraw as counsel pursuant to *Anders v. California*, 386 U.S. 738, 18 L. Ed. 2d 493, 87 S. Ct. 1896 (1967). This court denied that motion on January 20, 2009, and ordered a brief to be filed on the legal and factual viability of defense of others as a defense to the charge of criminal trespass to a residence.

## BACKGROUND

Defendant's conviction resulted from an incident that occurred on January 6, 2006, at the home of Nydia Ramirez. Following an altercation there that evening, defendant was indicted for mob action (720 ILCS 5/25—1 (West 2006)) and aggravated battery (720 ILCS 5/12—4 (West 2006)). Later, the State added a third count to the indictment, alleging the offense of felony criminal trespass to a residence (720 ILCS 5/19—4(a)(2) (West 2006)).

A bench trial commenced on January 12, 2007. The evidence adduced at trial established that at approximately 9 p.m. on January 6, 2006, Dainy Brainin was in the basement of her mother's house with her friend, Jessica Tamez-Hull, dying her hair. Brainin's mother, Nydia Ramirez, was watching TV in the living room. While in the basement, Brainin received on her cell phone several calls from a girl who identified herself as Vasti Guillen. Guillen was yelling at her and Brainin was yelling back and telling her not to call. Ramirez went to the basement and took the phone from Brainin because the repeated ringing was bothering her. Ramirez went back upstairs. Shortly thereafter, the doorbell rang and Brainin went upstairs and answered it. Tamez-Hull remained in the basement. The entrance of Ramirez's house consisted of a storm door that opened out and a main door that opened into the home. Brainin opened the main door and saw Dafne Nawrot, a friend of defendant, standing there alone. After a heated verbal exchange between Brainin and Nawrot, Ramirez joined Brainin at the door. A physical altercation ensued between Ramirez and Nawrot, the details of which are the subject of disagreement by the witnesses.

The State called Dainy Brainin as its first witness. Brainin testified that Nawrot stood on the stoop and said, "What's up, bitch." Brainin did not see a car in the parking space in front of her home. Brainin did not recognize Nawrot, and she asked her who she was and if she was Vasti Guillen. Nawrot said, "You want to talk shit, talk shit now." Brainin had never threatened or fought with Nawrot previously and knew her only through Nawrot's sister, with whom Brainin had had problems in the past.

Brainin further testified that Ramirez came to the door. Nawrot was holding the storm door open. Ramirez told Nawrot to leave three times, but she refused. After the third time, Ramirez pushed Nawrot two steps backward and off the stoop. Nawrot said, "You fucked up, bitch," and swung at Ramirez's head and grabbed her by the hair. Ramirez grabbed Nawrot by the hair. They continued to pull each other's hair while moving into the home and toward the living room. Brainin attempted to separate Ramirez from Nawrot by grabbing

Ramirez's neck and yelling for her to stop. Brainin pulled Ramirez onto the couch, resulting in Ramirez being on top of Brainin and Nawrot being on top of Ramirez. Brainin did not see Tamez-Hull during the incident.

Brainin testified that she saw a "big girl," whom she identified as defendant, push the door open. Brainin saw defendant throw a "white ball or something" against the wall as she came through the door. Another female followed defendant through the door. Brainin testified that defendant got on top of Ramirez and started hitting her, but Brainin admitted that she could not actually see defendant.

Brainin further testified that, at some point, she got out from under Ramirez, went downstairs to the basement, and called the police from her cell phone. Brainin acknowledged on cross-examination that although she saw only three girls come into the house, she told the 911 dispatcher that five girls had entered. After three minutes, Brainin went back upstairs and saw blood on the living room floor and both the storm and main doors open. Brainin initially told police that everyone who entered the house was punching and kicking Ramirez, but at trial she admitted that she had been dishonest with the police. Brainin also told police that Vasti Guillen, as well as a number of other girls, had been in the house.

The State's next witness was Jessica Tamez-Hull, who testified that she went to the top of the basement stairs to see what the loud arguing was about. Tamez-Hull saw Brainin and Ramirez arguing with the person at the door. After the fighting began, Tamez-Hull ran to shut the door, fearing more girls would enter the house. As she tried to lock the door, defendant pushed the door open. Tamez-Hull was pushed back with it, heard defendant say, "Oh, hell, no," and saw defendant throw something white toward the living room area where the fighting was occurring. Another girl followed defendant into the house. Tamez-Hull went to the basement at that point and did not see any punches thrown.

Nydia Ramirez testified next for the State. Her account of the events at the door was substantially similar to Brainin's. Ramirez testified that a few seconds after being pushed (by Nawrot) and pulled (by Brainin) into the living room, she saw three other girls come into the house. Ramirez saw one Hispanic girl and one tall, heavy-set, white female come in. The females jumped on her and "three, four people" were pulling her hair. The white female punched her head three or four times and yelled, "You fucked up, bitch." As the group tried to drag Ramirez outside, she kicked three times. When Ramirez kicked the third time, Nawrot bit her leg. Ramirez agreed that she was not sure how many girls came in, but she saw three girls leaving.

Ramirez called 911 and ran out the open front door. She was looking for Brainin and Tamez-Hull when police arrived. At the time, Ramirez was unable to tell police specifically who caused each of her injuries, which included bruises, scratches, a bite mark, and a missing clump of her hair. Five days later at the police station, Ramirez was able to identify Nawrot as the girl who entered her home initially and defendant as the one who punched her head. At no time did Ramirez authorize Nawrot or defendant to enter her home.

The State next called Detective Matt Thomas, who testified that he interviewed defendant and Nawrot about the incident five days afterwards, on January 11, 2006. Thomas testified that Nawrot told him she had been receiving harassing phone calls earlier in the day from unknown females calling from restricted numbers. During one such call, the voice on the other end said, "Bitch, don't be scared, come over here." According to Thomas, Nawrot assumed that the caller was Tamez-Hull, with whom she had had an altercation a few weeks prior, and that Brainin was also involved in the calls. Nawrot learned that a mutual friend had given Nawrot's cell phone number to Brainin upon Brainin's request. Nawrot decided to go over to Brainin's house and confront her about the calls. Nawrot asked defendant to give her a ride.

Thomas testified that Nawrot described the following sequence of events. Defendant and Nawrot drove to Brainin's house. Nawrot later admitted to Thomas that Vasti Guillen also went with them. Defendant parked the car in front of the residence and remained in the car, while Nawrot went to the door and rang the doorbell. Nawrot did not think Guillen left the car. When Brainin answered the door, Nawrot did not recognize her. Nawrot asked her if she was Dainy Brainin. Brainin asked her who she was. Nawrot said, "Don't act stupid, you know who I am." Brainin said that she did not know who Nawrot was and that Nawrot had the wrong house. Nawrot repeated her statement. Brainin then asked Nawrot if her name was Vasti. Nawrot said she was not Vasti. At that point, Ramirez came to the door, and Nawrot assumed the older female was Brainin's mother. Ramirez asked Nawrot who she was and what she was doing there. Nawrot said she wanted to talk to Brainin about the harassing phone calls. Ramirez told Nawrot that she had no business there and to leave. Nawrot told Ramirez that she would not leave until she had a chance to confront Brainin about the harassing calls. Ramirez then came outside and shoved her. Nawrot told Ramirez not to put her hands on her, because Nawrot had never put her hands on Ramirez. Ramirez then grabbed Nawrot's arms and hair and pulled her into the home.

Thomas further testified that Nawrot told him she saw defendant enter the house as Tamez-Hull tried to close the door. Defendant rushed toward the living room and pushed Ramirez's arms away from Nawrot, freeing Nawrot so they could leave. As defendant and Nawrot drove away, they saw police cars approaching the house. They went to defendant's residence where defendant took pictures of Nawrot's injuries, which were scratches to the face, redness of the arms, and a bloody nose.

Thomas testified that following his interview of Nawrot, he spoke to defendant. Defendant's description of the events of January 6, 2006, was as follows. Defendant said she got home from work at about 8 p.m. and went to visit Nawrot. Nawrot told defendant that she had received threatening phone calls from "those girls." Nawrot asked defendant to drive her to Ramirez's residence. Defendant did so and remained in the car while Nawrot went to the front door. Defendant saw Nawrot speak with Brainin and then Ramirez. Defendant heard Ramirez yell at Nawrot. Defendant saw Ramirez push Nawrot and heard Nawrot say, "[D]on't disrespect me because I haven't disrespected you." She saw Ramirez grab Nawrot's shirt and drag her into the house. Defendant then ran toward the door as it was closing and pushed her way in.

Following the State's case in chief, the defense moved for a directed finding. The trial court granted the motion for the first and second counts, mob action and aggravated battery, but denied it for the third count, criminal trespass to a residence.

Defendant testified that she drove to Ramirez's house and remained in her car. Defendant saw Ramirez push Nawrot and grab Nawrot by her shoulders and hair. She did not exit her vehicle until she saw Ramirez dragging Nawrot into the house. Defendant believed that Nawrot was going to be hurt. The door was halfway open and defendant felt no pressure against the door as she entered. On cross-examination, defendant denied telling Thomas that she had pushed her way inside, as she had only pushed the door open. Defendant agreed that she had a cell phone with her, but never called the police. She acknowledged she did not yell at Nawrot to come back to the car and did not drive the car to get help. Defendant admitted that she had not been invited into the house and had never been inside it before. Defendant was aware that people were present inside the house.

After both sides rested, the trial court stated:

"I don't think I need any argument. I am still not convinced that going to the defense of others is warranted in this case. She had no right to enter the person's home. It's simple as that. There is a finding of guilty on criminal trespass to residence."

On March 7, 2007, the trial court denied defendant's posttrial motion and sentenced her to 24 months' probation. Defendant timely appealed.

## ANALYSIS

Defendant contends that (1) the State failed to prove beyond a reasonable doubt that she was guilty of criminal trespass to a residence, and (2) the trial court erroneously denied defendant the opportunity to make a closing argument.

### 1. Sufficiency of the Evidence

Defendant argues that the State failed to prove beyond a reasonable doubt that she acted without authority. According to defendant, her authority to enter derived from the statutory defense of defense of person. See 720 ILCS 5/7—1(a) (West 2006). The State maintains that it met its burden of proving that defendant entered without authority, because the affirmative defense of defense of person does not apply to the offense of criminal trespass to a residence. We thus address whether the State met its burden of proving defendant guilty beyond a reasonable doubt of the offense of criminal trespass to a residence, determining *de novo* whether the defense of defense of person is applicable.

When a court reviews the sufficiency of the evidence, it must determine " 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " (Emphasis in original.) *People v. Phillips*, 215 Ill. 2d 554, 569-70 (2005), quoting *Jackson v. Virginia*, 443 U.S. 307, 319, 61 L. Ed. 2d 560, 573, 99 S. Ct. 2781, 2789 (1979). It is the province of the fact finder to assess the credibility of witnesses, weigh the evidence, decide what inferences it supports, and settle any conflicts in it. *People v. Ortiz*, 196 Ill. 2d 236, 259 (2001). In a bench trial, it is the judge, as the trier of fact, who makes these determinations. *People v. Mullen*, 313 Ill. App. 3d 718, 724 (2000). We will neither retry a defendant nor impose our judgment upon the trier of fact. *People v. Cunningham*, 212 Ill. 2d 274, 279-80 (2004); *Ortiz*, 196 Ill. 2d at 259.

■ Section 19—4(a)(2) of the Criminal Code of 1961 (Code) provides: "A person commits the offense of criminal trespass to a residence when, without authority, he or she knowingly enters the residence of another and knows or has reason to know that one or more persons is present." 720 ILCS 5/19—4(a)(2) (West 2006). Here, defendant admits she knowingly entered Ramirez's home with the knowledge that persons were inside. At issue is whether she had authority to do so. The Code does not define "authority."

Criminal trespass cases consistently refer to the source of the authority to enter as the consent or permission of a person having an ownership or possessory interest in the property. See *People v. Godfrey*, 382 Ill. App. 3d 511, 514 (2008) (State met its burden of proving unauthorized entry where homeowner locked her door and did not open it to the defendant at midnight, despite homeowner's invitation to the defendant earlier in the evening); *People v. Reynolds*, 359 Ill. App. 3d 207, 212-13 (2005) (evidence was sufficient to establish that the defendant did not have authority to enter, although the defendant had previously visited the house, because owner and occupants of the house did not give permission to enter on the morning in question); *People v. Banks*, 281 Ill. App. 3d 417, 421 (1996) (owners' interest in the house was superior to that of their daughter, and any authority that she might have had to give the defendant access was withdrawn after her father told the defendant he was not allowed in the house unless invited by a parent); *People v. Brown*, 150 Ill. App. 3d 535, 538-40 (1986) (evidence was sufficient to establish that the defendant entered victim's house without authority, even though victim permitted him to retain a set of keys after he moved out, where victim did not grant the defendant authority to enter on the day in question and the defendant cut or tore a window screen to get in the house). Thus, Illinois law treats a person with either an ownership or a possessory interest in the property as a lawful source of authority to enter the premises under section 19—4.

Here, neither the homeowner, Ramirez, nor her daughter, Brainin, gave defendant permission to enter. Ramirez and Brainin testified that they were unaware of defendant's presence until she pushed her way through the door. Defendant does not argue that she had anyone's permission to enter. Indeed, she admitted that she had not been invited to enter. Accordingly, a rational trier of fact could have found that defendant did not have authority from either the owner or one with a possessory interest.

We note defendant argues that our review of the sufficiency of the evidence should be *de novo* because, according to defendant, the facts are not in dispute. We grant defendant's motion to cite additional authority in support of her proposition and we consider *People v. Chirchirillo*, 393 Ill. App. 3d 916 (2009). In *Chirchirillo*, we reviewed *de novo* a challenge to the sufficiency of the evidence where the issue was whether the uncontested fact that the State did not establish that the codefendant was a convicted felon precluded finding the defendant guilty of unlawful possession of a weapon by a felon under a theory of accountability. *Chirchirillo*, 393 Ill. App. 3d at 921.

Here, even reviewing *de novo* the sufficiency of the evidence with respect to the element of authority, we still hold that the State met its burden. This is so because Illinois law is clear that the authority to enter a residence generally derives from the homeowner or one with a possessory interest in the home. As noted above, defendant does not maintain that she had permission to enter from any such person. Furthermore, based on the following discussion, we reject defendant's argument that her entry was authorized by her justification in defending another.

■ Defendant in essence contends that by operation of law she had incidental or implied authority to enter, because she had authority to use force in defense of another once she entered. In Illinois, self-defense and defense of others are combined in section 7—1 of the Code defining justifiable use of force in defense of person, which reads: "A person is justified in the use of force against another when and to the extent that he reasonably believes that such conduct is necessary to defend himself or another against such other's imminent use of unlawful force." 720 ILCS 5/7—1(a) (West 2006). Defense of person is an affirmative defense. 720 ILCS 5/7—14 (West 2006). "The legal effect of an affirmative defense is to admit that the acts occurred, but to deny responsibility." *People v. Podhrasky*, 197 Ill. App. 3d 349, 352 (1990); see also *People v. Rodriguez*, 336 Ill. App. 3d 1, 15 (2002) (by raising the affirmative defense of self-defense, the defendant admitted the homicide, but denied criminal responsibility). Here, defendant's reliance on section 7—1 is not as an affirmative defense to an otherwise illegal entry, but rather as a source of implied authority to enter in order to utilize force in defense of another as justified by section 7—1.

Therefore, we must address whether section 7—1 applies to section 19—4 to provide implied authority to enter, by operation of law. Our determination necessitates comparison of these two provisions. We determine that the issue presented, one of first impression, involves a question of law, which we review *de novo*.[2] See *Moller v. Lipov*, 368 Ill. App. 3d 333, 346 (2006).

---

[2]We are unable to determine from the trial court's language whether it found the defense inapplicable on the facts or as a matter of law. In denying defendant's motion for a directed finding, the court stated, "This has nothing to do with defense of others." Pronouncing its finding of guilt, the court concluded, "I am still not convinced that going to the defense of others is warranted in this case." Finally, in denying defendant's posttrial motion, the court stated, "I don't believe those defenses [defense of other and necessity] are available in this situation or were other alternatives."

In examining the language of section 7—1, we first note that nothing in the section limits its application to particular offenses. Yet, it is most often applied as a defense to crimes such as murder or battery, to name just two, to justify an individual's use of force and is generally restricted to prosecutions for crimes against the person. See *State v. Olsen*, 99 Wis. 2d 572, 579-80, 299 N.W.2d 632, 636 (App. 1980); 1 W. LaFave & A. Scott, Substantive Criminal Law §5.7(a) (1986). Courts that have considered the applicability of the defense of defense of person to other offenses, such as disorderly conduct, have analyzed whether the defense logically applies to the conduct underlying the charge. For example, in *In re T.W.*, 381 Ill. App. 3d 603, 606 (2008), our appellate court considered the conduct forming the basis of the charge of disorderly conduct, a physical fight on a school bus. The court reasoned that because the victim acted physically in such a way to threaten bodily harm, the "respondent was entitled to defend herself." *In re T.W.*, 381 Ill. App. 3d at 611. The court concluded that "the affirmative defense of self-defense applies *in this situation* to the charge of disorderly conduct." (Emphasis added.) *In re T.W.*, 381 Ill. App. 3d at 611.

In *Olsen*, the appellate court in our sister state undertook a similar analysis but reached the opposite conclusion. There, the court also considered the applicability of self-defense to a charge of disorderly conduct. The conduct underlying the charge was engaging in a protest at a nuclear power plant by blocking the roadway to prevent passage of a truck carrying a spent fuel rod out of the plant. *Olsen*, 99 Wis. 2d at 574, 299 N.W.2d at 633. The court observed that the defense of person defense acts to justify the use of force and, therefore, has generally been restricted to offenses against the person, such as murder or assault. *Olsen*, 99 Wis. 2d at 579-80, 299 N.W.2d at 636, citing W. LaFave & A. Scott, Criminal Law §53, at 391 (1972). The court held that "[i]n the absence of an allegation or evidence that defendant used force, the trial court was correct in ruling that the defenses of self-defense and defense of others were not available to defendant." *Olsen*, 99 Wis. 2d at 579-80, 299 N.W.2d at 636.

Here, aided by the analyses in *In re T.W.* and *Olsen*, we consider the applicability of the defense of defense of person to the offense of criminal trespass to a residence. Section 7—1 delineates the justifiable use of force in defense of self or another person, providing: "A person is justified in the use of force against another when and to the extent that he reasonably believes *that such conduct is necessary to defend* himself or another against such other's imminent use of unlawful force." 720 ILCS 5/7—1(a) (West 2006). "Force" is not defined as used in this provision, but commonly it refers to "power, violence, or pres-

sure directed against a person or thing." Black's Law Dictionary 673 (8th ed. 2004). Section 7—1 limits the meaning of force by specifying the object of the force as another person. As defined in section 19—4, criminal trespass to a residence does not require force and is completed the moment one enters the residence without authority. 720 ILCS 5/19—4(a)(2) (West 2006); see *People v. Beauchamp*, 389 Ill. App. 3d 11, 14 (2009) (stating that a burglary is complete upon entry without authority and with the requisite intent). Whether one acts with or without force is irrelevant under section 19—4. Moreover, criminal trespass to a residence is not a crime against a person; the behavior constituting the offense is directed against an inanimate object. Thus, the conduct prohibited in section 19—4, unauthorized entry to a residence, can never have as its basis behavior presenting the threat of bodily harm. Consequently, the justification of the use of force against a person in section 7—1 has no logical relevance to the offense of criminal trespass to a residence in section 19—4.

Defendant relies on *In re T.W.* for the proposition that section 7—1 can apply to an offense that does not require the use of force and is not a crime against a person. In *In re T.W.*, the respondent was adjudicated delinquent based, in part, on the trial court's finding that she had committed the offense of disorderly conduct (720 ILCS 5/26—1(a)(1) (West 2006)). *In re T.W.*, 381 Ill. App. 3d at 604. The appellate court held that self-defense was an affirmative defense to disorderly conduct where the conduct underlying the charge was fighting on a school bus. *In re T.W.*, 381 Ill. App. 3d at 605, 611. Noting that the applicability of self-defense to the charge of disorderly conduct was an issue of first impression, the court began by citing cases from other jurisdictions that had applied the defense to disorderly conduct. Each of those cases involved a fight or a threat of bodily harm. The court then reasoned that nothing in section 7—1 restricted the defense of defense of person to particular offenses. However, the court limited its holding, stating that "the affirmative defense of self-defense applies *in this situation* to the charge of disorderly conduct." (Emphasis added.) *In re T.W.*, 381 Ill. App. 3d at 611. Because the victim's conduct toward the respondent was "an offense of a physical nature and carried with it the potential to cause bodily harm" (*In re T.W.*, 381 Ill. App. 3d at 611), the conduct underlying the charge of disorderly conduct was the respondent's use of force against her aggressor (*In re T.W.*, 381 Ill. App. 3d at 606), and thus the theory of self-defense was appropriate to the conduct. As noted above, what was important to the court was not whether force was a required element of the offense, but rather whether the behavior forming the basis of the offense presented the threat of bodily harm.

While the Code does not include the element of force in the offense of disorderly conduct, the offense "embraces a wide variety of conduct serving to destroy or menace the public order and tranquility. The offense may include not only violent acts, but acts and words likely to produce violence in others." *In re B.C.*, 176 Ill. 2d 536, 552 (1997). The holding of *In re T.W.* was thus limited, as the court determined based on the factual circumstances of the case that the respondent had a right to defend herself, but it did not decide that the defense was available for all acts that could constitute disorderly conduct. *In re T.W.*, 381 Ill. App. 3d at 611. Thus, the holdings of *In re T.W.* and *Olsen*, though reaching opposite conclusions on the applicability of the defense to the offense of disorderly conduct,[3] are not inconsistent, as the behavior forming the basis of the charge in each case was different. Within the broad range of conduct under the offense of disorderly conduct, only some behaviors, *i.e.*, those involving physical force presenting the threat of bodily harm, will fall within the ambit of section 7—1.

In contrast, the language of section 19—4 describing criminal trespass to a residence is not so broad. It requires that the offender knowingly enter the residence of another, without authority. Unlike disorderly conduct, which, depending upon the behavior forming the basis of the charge, may require the State to prove the use of force against a person, the offense of criminal trespass to a residence, no matter how it is charged, never requires proof of force. Although force may be used to effect an entry or used subsequent to an entry, the criminal trespass offense is complete upon entry. Conduct that occurs before or after entry, whether forceful or not, has no bearing upon a defendant's guilt.

Our research reveals no other jurisdiction that has applied the defense of defense of person to a criminal trespass offense. The two out-of-state cases upon which defendant relies are inapposite to the legal question before us. In *Smith v. United States*, 281 A.2d 438, 439 (D.C. 1971), the appellate court observed that a *bona fide* belief in the right to enter could be a valid defense to unlawful entry, because it could negate the criminal intent required under the District of

---

[3]The statutory language describing disorderly conduct in Wisconsin is similarly broad. Compare Wis. Stat. §947.01 (2009) ("Whoever, in a public or private place, engages in violent, abusive, indecent, profane, boisterous, unreasonably loud or otherwise disorderly conduct under circumstances in which the conduct tends to cause or provoke a disturbance is guilty of a Class B misdemeanor") with 720 ILCS 5/26—1(a)(1) (West 2006) (defining disorderly conduct as "any act [done] in such unreasonable manner as to alarm or disturb another and to provoke a breach of the peace").

Columbia statute at issue. That statute, unlike the criminal trespass statute here, required proof of intent to be on the premises "against the will of the lawful occupant." D.C. Code §22—3102 (1981) (relevant statutory language unchanged from the time *Smith* was decided). Moreover, the same court later clarified that the *bona fide* belief defense "was not meant to excuse intended acts, based on an erroneous belief they are legally defensible under penal laws." *Morgan v. District of Columbia*, 476 A.2d 1128, 1133 (D.C. 1984) (belief must be based on a reasonable mistake of fact). Therefore, assuming *arguendo* that *Smith* is even relevant to the instant case, because defendant's entry was intentional and based on a mistake of law (that the defense of another justified her entry), the *bona fide* belief defense would not apply. See *McGloin v. United States*, 232 A.2d 90, 91 (D.C. 1967) (holding that the *bona fide* belief defense prevents conviction of the unintentional offender).

Neither does defendant's reliance on *State v. Brechon*, 352 N.W.2d 745 (Minn. 1984), persuade us that the defense of defense of person should apply to the offense of criminal trespass. In *Brechon*, the state supreme court discussed the "without claim of right" language in its criminal trespass statute. The court noted that a claim of right arises from a defendant's good-faith belief that he was the true owner or was authorized to enter by the true owner. *Brechon*, 352 N.W.2d at 749. The court concluded: "Subjective reasons not related to a claimed property right or permission are irrelevant and immaterial to the issue of claim of right." *Brechon*, 352 N.W.2d at 750. Thus, *Brechon* does not support defendant's argument that her good-faith belief in her right to enter to defend her friend was a form of a claim of right, because her belief had nothing to do with a property right.

Nonetheless, defendant argues that it would be "illogical" for the defense of defense of person to exonerate her of the use of physical force to aid her friend once she was inside the house but not of the entry into the house to render the aid. She maintains that, if her conduct once inside the home could be justified by section 7—1, authority to enter must also inhere in section 7—1. Defendant also suggests more generally that so restricting the applicability of section 7—1 would greatly limit the scope of the defense, making it viable only for offenses occurring in public places or in one's own home.

Defendant's main argument—that it is illogical to apply section 7—1 to justify her use of force against Ramirez once inside the house but not to justify her entry into the house—lacks merit. The trial court granted defendant a directed finding on the aggravated battery count because the State did not prove who inflicted which injuries to Ramirez. The trial court did not reach the question of whether the af-

firmative defense of defense of person was available to defendant on the charge of aggravated battery allegedly committed once she was inside the home. Thus, defendant's contention that the court's holding could have produced an incongruous result is merely hypothetical.

Defendant's broader public policy concern that restricting section 7—1 will discourage people from coming to the defense of others is also unwarranted. This is so because the defense of necessity, broad in language and scope, may be applied to the offense of criminal trespass to a residence in appropriate factual situations. See 720 ILCS 5/7—13 (West 2006) ("Conduct which would otherwise be an offense is justifiable by reason of necessity if the accused *** reasonably believed such conduct was necessary to avoid a public or private injury greater than the injury which might reasonably result from his own conduct"). In other words, the defense of necessity could justify the entry itself, while section 7—1 could justify the use of force once inside. However, in the present case, we do not consider the defense of necessity, as defendant does not raise it on appeal and, indeed, in both her reply brief and at oral argument, disclaims reliance on it. Consequently, we reject defendant's speculative concern.

■ In conclusion, we reject defendant's invitation to read section 7—1 to provide implied authority to enter when the conduct subsequent to the entry is expressly justified by section 7—1. Such a reading has no basis in either the statutory language or the case law and we are unpersuaded that public policy compels it. Therefore, we hold that section 7—1 does not provide authority, implied or otherwise, to enter under the definition of criminal trespass to a residence in section 19—4. Accordingly, as discussed above, the State proved defendant guilty beyond a reasonable doubt of criminal trespass to a residence.

## 2. Closing Argument

■ Defendant next argues that she was denied due process and her right to a fair trial when the trial court announced its findings after both sides rested, denying defendant the opportunity to make a closing argument and effectively prejudging her guilt. The State replies that defendant forfeited the issue by failing to object at trial or raise the issue in a posttrial motion and that, in any event, the trial court did not foreclose defendant from presenting a closing argument, but merely stated that it was not necessary.

The record indicates that after both sides rested, the trial court announced its findings without interruption or objection by defense counsel. Moreover, defendant failed to include the issue in her posttrial motion. Both a contemporaneous objection and a written posttrial motion are required to preserve an issue for appellate review.

*People v. Bannister*, 232 Ill. 2d 52, 65 (2008), citing *People v. Enoch*, 122 Ill. 2d 176, 186 (1988). As defendant failed to do either, she has procedurally defaulted the issue. See *Bannister*, 232 Ill. 2d at 65; *Enoch*, 122 Ill. 2d at 186.

Nevertheless, the right to present a closing argument at trial is of constitutional magnitude, regardless of whether the trial is before a judge or a jury. *Herring v. New York*, 422 U.S. 853, 864-65, 45 L. Ed. 2d 593, 602, 95 S. Ct. 2550, 2556 (1975); *People v. Smith*, 249 Ill. App. 3d 460, 465 (1993). Despite procedural default, when a claimed error affects substantial rights, we may address the issue under the plain-error doctrine. See 134 Ill. 2d R. 615(a); *Smith*, 249 Ill. App. 3d at 465. The plain-error doctrine allows a reviewing court to reach an unpreserved error affecting substantial rights when: the evidence in a case is so closely balanced that the guilty verdict may have resulted from the error and not the evidence; or the error is so serious that the defendant was denied a substantial right, and thus a fair trial, regardless of the closeness of the evidence. *People v. Herron*, 215 Ill. 2d 167, 178-79 (2005); see also *People v. Naylor*, 229 Ill. 2d 584 (2008) (applying plain-error doctrine to case involving bench trial). In addressing defendant's plain-error contention, we first determine whether error occurred at all, because, in the absence of error, there can be no plain error. *Bannister*, 232 Ill. 2d at 65, 71.

The trial court did not deny defendant the right to a closing argument when it stated, "I don't think I need any argument. I am still not convinced that going to the defense of others is warranted in this case." The trial court's statement that closing arguments were not necessary does not equate to a denial of the opportunity to make a closing argument. Defendant could have sought a closing argument if she differed with the trial court's assessment. See *People v. Liggins*, 229 Ill. App. 3d 621, 623 (1992) ("If a trial court in a bench trial enters its findings directly after the presentation of evidence, defense counsel has the right to object and be given the opportunity to present a closing argument").

We find *Liggins* instructive. In *Liggins*, at the conclusion of the presentation of evidence, the trial court stated, "I don't believe I need closing argument," and pronounced its finding. *Liggins*, 229 Ill. App. 3d at 623. The appellate court held that the trial court had not deprived the defendant of the right to a closing argument because, where the defendant has made no attempt to seek a closing argument, "it cannot be said that a party was denied the opportunity to present a closing argument." *Liggins*, 229 Ill. App. 3d at 623, citing *People v. Coleman*, 212 Ill. App. 3d 997, 1004 (1991) (the defendant did not attempt to seek closing argument where he made no request and did not object to the trial court's actions). Under *Liggins*, defendant in the

present case cannot maintain she was denied the opportunity to make a closing argument, because she neither requested one nor objected when the trial court announced its findings. Accordingly, since no error occurred, there can be no plain error. See *Bannister*, 232 Ill. 2d at 71.

Defendant relies on *Smith* to support her argument that the denial of the right to a closing argument is prejudicial. However, the defendant in *Smith* was not denied the opportunity to present a closing argument. *Smith*, 249 Ill. App. 3d at 466. The appellate court determined that the defendant, who represented himself with the assistance of standby counsel, knew enough to move and argue for a directed finding and would have requested a closing argument if he had wanted one. *Smith*, 249 Ill. App. 3d at 463, 466. While the appellate court held that the trial court erred, the error was in failing to make a record that the defendant knew and expressly waived his right to present a closing argument. *Smith*, 249 Ill. App. 3d at 466. As defendant here does not argue that the trial court erred in failing to make a record that she waived closing argument, *Smith* is inapposite.

Because we hold that the trial court did not deny defendant the right to a closing argument—the only basis upon which she argues the trial court prejudged her guilt—we reject defendant's contention that the trial court prejudged the case.

For the reasons given, we affirm the judgment of the circuit court of Du Page County.

Affirmed.

BOWMAN and O'MALLEY, JJ., concur.