2020 IL App (1st) 170581-U

No. 1-17-0581

Order filed March 17, 2020

Second Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 12 CR 11628 |
| | ) | |
| JULIUS PRICE, | ) | Honorable |
| | ) | Mary Margaret Brosnahan, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE PUCINSKI delivered the judgment of the court.
Presiding Justice Fitzgerald Smith and Justice Lavin concurred in the judgment.

**ORDER**

¶ 1     *Held*: Defendant's four convictions for aggravated battery with a deadly weapon are affirmed over his contention that the State failed to prove beyond a reasonable doubt that he acted without legal justification.

¶ 2     Following a bench trial on January 20, 2017, defendant Julius Price was convicted of one count of aggravated battery with a deadly weapon against each of four separate persons (720 ILCS 5/12-3.05(f)(1) (West Supp. 2011)) and sentenced to 10 years' imprisonment on each count to be served concurrently. Defendant had 1695 days (or 4.65 years) of credit for time served. As of the

filing of his brief on March 6, 2019, defendant has served his prison term and MSR. On appeal, defendant contends that the evidence presented was insufficient to sustain his convictions because the State failed to prove beyond a reasonable doubt that he acted without lawful justification. For the following reasons we affirm.

¶ 3    Defendant and codefendant, Keith Gunn, were charged with 4 counts of attempt first degree murder, 2 counts of armed robbery, and 10 counts of aggravated battery stemming from a May 15, 2012 robbery and stabbing incident that occurred on a Chicago Transit Authority (CTA) Red Line stop. Prior to trial, the State nol-prossed four counts of aggravated battery. Defendant and Gunn were tried in a joint bench trial. Prior to the end of trial, Gunn pled guilty to one count of armed robbery with a dangerous weapon, and the state nol-prossed all other counts against Gunn. At trial, defendant's theory of the case was that he acted in defense of Gunn and himself.

¶ 4    Manoj Chaudhary testified, through a translator, that on May 15, 2012, at approximately 11:20 p.m. he was on the CTA Red Line train traveling northbound. He was holding his cellphone and looking at pictures. When the train reached the Clark and Division stop, a man grabbed Chaudhary's phone from his hands, and hit him on the head five or six times with a gun. In court, Chaudhary identified this man as Gunn. When Chaudhary looked up, he saw a portion of the gun near his head and he gave his phone to Gunn. Gunn fled the train and fought with men on the platform. Chaudhary stayed on the train until Gunn fled the station. Chaudhary was taken to a hospital, treated and released the same day. He identified People's exhibits 11, 12, and 13 as photographs of his injuries and how he appeared at the hospital after the incident. Chaudhary later viewed a lineup and identified Gunn as the person who hit him and took his phone.

¶ 5     On cross-examination by counsel for Gunn, Chaudhary stated Gunn grabbed his phone with his left hand and was holding the gun with his right hand. Gunn did not threaten to shoot him or aim the gun at him. Counsel for defendant adopted this cross-examination and, under further questioning, Chaudhary stated that only one person hit him and took his cellphone.

¶ 6     Jena Moore testified that on May 15, 2015, after 11:00 p.m., she and a friend were waiting for the southbound train at the CTA Red Line stop of Clark and Division. The northbound train entered the station and she saw, a few feet away from her, a man holding a black gun get tackled by another man, who was part of the Guardian Angels community caretaking organization. Her friend grabbed her hand and they ran upstairs. Moore did not identify any individuals.

¶ 7     Michael Fuentes testified that on May 15, 2012, at approximately 11:23 p.m. he was patrolling with three other members of the Guardian Angels: Mario Rodriguez, Keunthi Davis and Erik Eulogio. The main goal of the Guardian Angels is to prevent crime, and they may make a citizen arrest if witnessing a serious crime. Fuentes was wearing the uniform of the Guardian Angels: a red beret and a Guardian Angels t-shirt. He was also wearing a red vest. Fuentes and the other men exited a northbound train of the CTA Red Line onto a central platform at the Clark and Division stop. As they were waiting for a southbound train, another northbound train approached. Fuentes, Rodriguez, Davis, and Eulogio spaced themselves out on the platform every few train cars with Fuentes furthest to the north. Fuentes identified Gunn in court as being on the approaching northbound train. Shortly before the train came to a stop at the station, Fuentes saw Gunn retrieve a black gun from his waist and strike a passenger in the head with the butt of the gun. Gunn grabbed the passenger's phone, and Fuentes yelled, "code red," a signal that there is an emergency, to the other Guardian Angels.

¶ 8        When the train came to a stop, multiple passengers ran out of the train screaming. Gunn ran out of the train, put the gun in his waist, and then Fuentes grabbed him. Because of Gunn's momentum, he was able to break free from Fuentes and run towards the exit stairs. Gunn turned around and tried to point the gun towards Fuentes. As he did so, Eulogio grabbed Gunn, who was able to break free from Eulogio. Rodriguez then grabbed Gunn and all four Guardian Angels "tussl[ed]" with him. As they did so, they attempted to move the gun, which was in Gunn's hand, so that it was not pointing at any of them. During the struggle, Fuentes ended up lying on top of Gunn, Davis had a hold of Gunn's right hand (in which he was holding the gun), Rodriguez had a hold of Gunn's left leg, and Eulogio was towards Gunn's head.

¶ 9        As the men were holding Gunn down, Fuentes heard somebody say, "what's going on?" Rodriguez responded "stand back. This guy has a gun. He just robbed somebody." Fuentes was then hit twice in the back of the head with something hard. In court, Fuentes identified the man who hit him as defendant. Fuentes saw Rodriguez apprehend defendant and heard something open "like a switch blade or knife." Fuentes also noticed Rodriguez was holding his head. Defendant then went to Fuentes' righthand side and told Fuentes to let Gunn go. Defendant moved a knife towards the head of Fuentes, who put up his right arm. Defendant placed the knife in Fuentes' right elbow and "yank[ed] it open." Fuentes started bleeding and defendant continued to stab him. While Fuentes was moving and trying to avoid being stabbed, defendant stabbed Davis. Defendant was eventually able to pull Gunn away from the Guardian Angels and the pair fled. As defendant and Gunn exited the station, defendant "slash[ed]" Rodriguez in the arm. Fuentes, and the rest of the Guardian Angels, waited for emergency personnel to arrive. As a result of the attack, Fuentes received 17 stiches on his arm. He identified photos of the injuries he sustained. The State entered

into evidence CTA video footage of the incident and, during his testimony, Fuentes narrated portions of the video. Fuentes identified defendant and Gunn in a photo array on May 17, 2012. He also identified Gunn in a lineup on June 1, 2012.

¶ 10    On cross-examination by counsel for defendant, Fuentes stated that he thought defendant said, "what's going on," "leave him alone," "[g]et off him," and "[l]et him go." Fuentes stated defendant hit him twice in the back of the head with a hard object. Rodriguez placed defendant in a chokehold and then defendant pulled out a knife. None of the Guardian Angels had police powers or had been to the police academy.

¶ 11    Rodriguez testified that on May 15, 2012, at approximately 11:20 p.m. he was volunteering as a Guardian Angel "to deter crime, [and] make citizen arrest[s]." Rodriguez exited the CTA Red Line at the Clark and Division stop that evening and was accompanied by Fuentes, Davis and Eulogio.[1] Rodriguez was dressed in a red beret, black pants, boots, and a white t-shirt with "Guardian Angel Safety Patrol" written on it. He heard Fuentes yell out "code red," which meant that there was an emergency and backup was needed. Rodriguez saw Fuentes struggling with a man and ran towards them. The man was trying to get away from Fuentes and ran towards Rodriguez, who grabbed him. In court, Rodriguez identified the man as Gunn. Gunn slipped out of Rodriguez's grasp and, as he ran towards the exit, Davis grabbed him. Then Rodriguez grabbed Gunn's torso, and Eulogio and Fuentes helped Rodriguez subdue Gunn. At this time, Gunn was on the ground with the four men on top of him, and Rodriguez saw that Gunn had a gun.

---

[1] Rodriguez referred to Eulogio by his first name because he did not know his last name, and Fuentes as Miguel Fuentes and not Michael Fuentes.

¶ 12    Rodriguez heard somebody yell, "what's going on?" Rodriguez stood up and said, "back off, [Gunn's] got a gun, he just robbed somebody." In court, Rodriguez identified the individual he spoke to as defendant. Rodriguez testified that defendant then pushed him aside, jumped on Fuentes, and started hitting him in the head. Rodriguez placed defendant in a chokehold. Defendant bit Rodriguez, who released his chokehold, and Rodriguez started hitting defendant on the side of the head. Defendant reached into his coat pocket, took out an object and stabbed Rodriguez on the top of the head. Rodriguez saw defendant stab Eulogio. Gunn and defendant then went towards the exit of the station. Rodriguez, Fuentes, Davis, and Eulogio did not chase after them because they had all been stabbed and were tending to their wounds. Rodriguez went to the hospital where his head was stapled shut and he received antibiotics for the bite on his arm. Rodriguez identified Gunn in a lineup as the individual with a gun that he grabbed at the Clark and Division stop. Rodriguez identified photos of the injuries he sustained as a result of the attack.

¶ 13    Defense counsel for Gunn cross-examined Rodriguez, who stated Gunn never threatened to shoot any of the Guardian Angels. Rodriguez explained that none of the Guardian Angels were armed with a knife. He explained that Gunn was only taken down once. When Gunn was trying to fight back, Rodriguez did not see him hit anyone. Defense counsel for defendant adopted this cross-examination and, after further questioning, Rodriguez stated he did not hear defendant yell "stop it."

¶ 14    Eulogio testified, through a translator, that on May 15, 2012, after 11:00 p.m. he was volunteering as a Guardian Angel with Fuentes, Davis, and Rodriguez on the platform at the Clark

and Division stop.[2] Eulogio was wearing black pants and a white t-shirt with "Guardian Angels" written on it. After Fuentes yelled "code red," Eulogio ran towards Fuentes. Eulogio saw passengers exit a train and Fuentes attempt to grab a man. Eulogio initially identified this man as defendant but explained later in his testimony that he had been confused and it was Gunn who struggled with Fuentes. Gunn escaped from the grasp of Fuentes, Eulogio, and Rodriguez before Davis managed to grab him. Fuentes, Davis and Gunn then struggled and fell to the ground. Eulogio helped the men hold Gunn down, and saw that Gunn was holding a black gun. Defendant arrived and yelled for the men to let go of Gunn. Rodriguez told defendant to "lay back." As Gunn attempted to get away, Eulogio walked around the stairs that were in the center of the platform. When he got around the stairs, he saw Gunn getting up. Eulogio attempted to grab defendant, but defendant stabbed him in the right arm above the elbow. Defendant also pushed him, causing him to fall to the ground. Defendant and Gunn then fled towards the escalator. Eulogio went to the hospital where he received 19 stiches. Eulogio identified Gunn from a lineup as the man with the gun on June 1, 2012.

¶ 15    On cross-examination by counsel for Gunn, Eulogio stated he never heard Gunn threaten to shoot any of the Guardian Angels. Defense counsel for defendant adopted this cross-examination. Eulogio did not see Rodriguez place defendant in a chokehold.

¶ 16    Davis testified that on May 15, 2012, about 11:00 p.m. he was volunteering for the Guardian Angels with Rodriguez, Fuentes, and Eulogio. The group exited a northbound train and patrolled the CTA Red Line stop at Clark and Division. A southbound train entered the station and

---

[2] During his testimony, Eulogio referred to Fuentes as Miguel Fuentes and not Michael Fuentes, and Rodriguez by his first name: Mario.

Davis saw Fuentes wrestling with a man. In court, Davis identified the man as Gunn. Gunn broke free from Fuentes and Eulogio attempted to grab him, but Gunn broke loose. As Rodriguez wrestled with Gunn, Davis ran towards them. Davis "bear hug[ged]" Gunn but Gunn broke free from him. Eventually, the Guardian Angels caught Gunn and a struggled ensued. Davis saw a gun in Gunn's right hand and placed his foot on Gunn's wrist, so the gun pointed towards the tracks. Defendant then walked up to the men and asked, "what was going on?" Rodriguez got up from holding Gunn and explained the situation to defendant. Davis stated that defendant then went "icepick mode." Davis demonstrated this action by raising his right hand above his head and moving it down forward in a stabbing motion. Davis did not remember who defendant stabbed. Gunn and defendant then fled. Davis went to the hospital where he was treated for a cut on his abdomen. He later identified Gunn and defendant in physical lineups as being the two men involved in the attack. He also identified photos of the injuries he sustained during the attack.

¶ 17    On cross-examination by counsel for Gunn, Davis stated he first saw Gunn's gun when Gunn was tackled to the ground for a second time. Gunn did not aim the gun at Davis, who did not have police powers and did not attempt to contact the police. Defendant's counsel adopted this cross-examination. Under defense counsel's further questioning, Davis remembered defendant saying "something * * * he just said, we asked what was going on."

¶ 18    Chicago police detective Jeffrey Ignowski obtained a CTA video of the May 15, 2012 incident and worked with the Chicago police news affairs department to disseminate still photos taken from the video. He was contacted by Michelle Johnson and compiled a photo array from which Fuentes positively identified Gunn and defendant.

¶ 19 The parties stipulated that, if called: Chicago police evidence technician Amy Campbell would testify that she took photos of the CTA platform, gathered multiple blood swabs, recovered biological material from the bite mark on Rodriguez and a buccal swab from Rodriguez; Chicago police evidence technician Charles Shepard would testify that he collected buccal swabs from Chaudhary, Davis, Eulogio, and Fuentes; investigator Walsh, with the office of the State's Attorney, would testify that he collected a buccal swab from defendant and Gunn;[3] Illinois state police forensic scientist Ronald Tomek would testify that he received and preserved various swabs used to collect blood, and other materials for DNA analysis from the May 15 incident; and Illinois state police forensic scientists Katrina Gomez and Jennifer Belna would testify they conducted DNA analysis on the swabs and three of the blood swabs taken from the Clark and Division stop contained a DNA profile matching Eulogio, one contained a DNA profile matching Fuentes, one contained a mixture of DNA profiles and the bite mark swab taken from Rodriguez contained a DNA profile matching defendant. The State rested.

¶ 20 Defense counsel moved for a directed finding of not guilty on all counts, arguing that defendant was not involved in the armed robbery, did not know it was going to occur, and had the specific intent to protect himself and Gunn. The court granted the motion for directed finding as to the armed robbery counts.

¶ 21 Defendant proceeded by way of stipulation. If called, Chicago police detective Andy Li, would testify that Davis told him defendant approached during the incident and "kept yelling get off him over and over again."

---

[3] The record does not include Walsh's first name.

¶ 22 Defendant testified that on May 15, 2012, Gunn was his boyfriend. Defendant was asleep on the train and, when he woke up, he saw people running off the train. He also saw Gunn in the middle of a group of men who were beating him up. Defendant was not familiar with the Guardian Angels and believed that he was witnessing a "gay bashing." Defendant yelled, "stop, stop, stop. Why you all got him." One of the men told him to step back and that Gunn had robbed someone. Defendant did not believe the man and then saw Gunn in a headlock. Defendant reached down and tried to "break it up." As he did so, another man tried to put defendant in a chokehold. Defendant bit the man's arm and was then hit in the back of the head, maced and placed into a chokehold.

¶ 23 Defendant testified he was losing conscious and thought he might fall off the platform. He reached into his pocket and retrieved a switchblade knife that was three to four inches long. He stabbed the man who had him in a chokehold in the head, prompting the man to release him. Defendant felt more punches and swung "the knife wild back and back." He explained that he did so in an attempt to keep the men back and free Gunn. Defendant and Gunn were able to leave the platform. Defendant suggested that they go to a hospital, but Gunn refused and told him that he was being "gay bashed."

¶ 24 On cross-examination, defendant stated he got on the train with Gunn, but they were not able to sit together. Defendant was asleep and did not know if Gunn had robbed someone. Defendant did not go to the hospital because he did not have any injuries. He explained that the mace that was sprayed on him stopped burning within 10 minutes. He did not report the crime to the police that day. On the next day, defendant saw the armed robbery on the news but did not turn himself in until a few weeks later, June 2, 2012. Defendant stated that he told detectives he was sleeping on the train, woke up to the commotion and helped a lady off the train.

¶ 25 In rebuttal, Detective Li testified that he interviewed defendant on June 2, 2012, and defendant said, "he was sitting across from a lady when Gunn got up and did something." Defendant told Li, "he looked at the lady, and they both rolled their eyes." Defendant declined to state what Gunn did, and defendant did not elaborate further. Defendant denied being punched, maced or placed in a second chokehold by any of the Guardian Angels. He never indicated that the incident was related to "gay bashing."

¶ 26 For purposes of impeachment, the State introduced into evidence, and defendant stipulated to, his two prior 2005 convictions for residential burglary under case Nos. 05 CR 28029 and 28030.

¶ 27 The court found defendant guilty of four counts of aggravated battery with a deadly weapon related to the attack against each of the four Guardian Angels. The court found defendant not guilty of four counts of attempted murder, and the two counts of aggravated battery related to Chaudhary. In announcing its decision, the court stated that defendant and Gunn were partners and "it would certainly defy logic that [defendant] had no idea whatsoever that Keith Gunn was armed with a weapon that night, or any time at all." The court also noted that defendant's "testimony was not credible whatsoever with respect to the issue of self-defense. His story did not make sense."

¶ 28 Defendant filed a motion for a new trial, which the court denied. In doing so, the court found "that the State proved beyond any doubt, much less beyond a reasonable doubt" that defendant committed four counts of aggravated battery.

¶ 29 At sentencing, the court noted that defendant's testimony was:

"incredible and unbelievable with respect to his recitation of the events. He is traveling with, hanging with a friend of Mr. Gunn. They are together that night, as they have been previously. They are together that night and the defendant indicated that he was taking a

nap when the armed robbery was going down in the car. * * * I also find it very hard to believe that [defendant] was just woken up in a fog from his nap on the L and thought these individuals were attacking or going to kill his friend, Mr. Gunn, for no reason, and, you know, that he came to that defense. So it was not a viable defense of others case in my view, and it was not a viable self-defense in my view."

In considering if defendant was provoked to act, the court noted that based on the testimony presented, including defendant's, there was no credibility to his version of events and there was no strong provocation. The court then sentenced defendant to four concurrent terms of 10 years' imprisonment.

¶ 30    Defendant filed a motion to reconsider sentence and, upon denial of the motion, filed a notice of appeal. On appeal, defendant contends that the State failed to prove beyond a reasonable doubt he acted without legal justification.

¶ 31    When a defendant challenges his conviction based upon the sufficiency of the evidence presented against him, we must ask whether, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *People v. Brown*, 2013 IL 114196, ¶ 48 (citing *Jackson v. Virginia*, 443 U.S. 307, 318-19 (1979)). In reviewing such an appeal, under this standard we draw "all reasonable inferences from the record in favor of the prosecution." *People v. Davison*, 233 Ill.2d 30, 43 (2009). It is the responsibility of the trier of fact to determine the witness' credibility, the weight given to their testimony, to resolve conflicts in the evidence, and to draw all reasonable inferences from the evidence. *People v. Ortiz*, 196 Ill. 2d 236, 259 (2001). We will not substitute our judgment for that of the trier of fact on issues involving the weight of the evidence or the credibility of the witnesses.

*People v. Brown*, 22013 IL 114196, ¶ 48. A reviewing court " 'will not reverse a conviction unless the evidence is so improbable, unsatisfactory, or inconclusive that it creates a reasonable doubt of defendant's guilt.' " *People v. Lloyd*, 2013 IL 113510, ¶ 42 (quoting *People v. Collins*, 214 Ill. 2d 206, 217 (2005)).

¶ 32    In order to sustain defendant's conviction for aggravated battery with a deadly weapon, the State was required to prove beyond a reasonable doubt that defendant used a deadly weapon to commit a battery. 720 ILCS 5/12-3.05(f)(1) (West Supp. 2011); *People v. Blanks*, 361 Ill. App. 3d 400, 412 (2005). A person commits battery when they without legal justification cause bodily harm to an individual. 720 ILCS 5/12-3 (West 2012). Consequently, "[l]egal justification is a defense to battery." *People v. Reyes*, 265 Ill. App. 3d 985, 991 (1993).

¶ 33    In this court, defendant argues that the State failed to prove beyond a reasonable doubt that he acted without legal justification. Specifically, he claims that the evidence showed that he reasonably believed the use of force was necessary to defend himself and Gunn against the use of unlawful force by a group of four men. We disagree.

¶ 34    After reviewing the record in the light most favorable to the State, we find that a rational trier of fact could conclude that defendant's use of force was not justified. A defendant is entitled to use force in self-defense and defense of others when such conduct is necessary to defend against unlawful force. *People v. Bryant*, 394 Ill. App. 3d 663, 671 (2009). To bring a claim of self-defense a defendant must provide some evidence " 'of each of the following elements: (1) force is threatened against a person; (2) the person threatened is not the aggressor; (3) the danger of harm was imminent; (4) the threatened force was unlawful; (5) he actually and subjectively believed a danger existed which required the use of the force applied; and (6) his beliefs were objectively

reasonable.' " *People v. Guja*, 2016 IL App (1st) 140046, ¶ 52 (quoting *People v. Jeffries*, 164 Ill.2d 104, 127–28 (1995)); accord 720 ILCS 5/7-1 (West 2012). Once the defendant does this, "the State has the burden of proving beyond a reasonable doubt that the defendant did not act in self-defense, in addition to proving the elements of the charged offense." *People v. Gray*, 2017 IL 120958, ¶ 50. The defendant's claim fails if the State disproves any one element of self-defense. *Id.*

¶ 35    Ultimately, the question of whether a defendant acted in self-defense is a question for the trier of fact. *People v. Garcia*, 407 Ill. App. 3d 195, 203 (2011). In making its determination, the trier of fact is not obligated to accept a defendant's claim of self-defense. *In re Jessica M.*, 399 Ill. App. 3d 730, 737 (2010). Instead, the trier of fact must consider the surrounding circumstances, the probability or improbability of the defendant's testimony, and the testimony of other witnesses. *Id.*

¶ 36    Here, the central issue is the reasonableness of defendant's subjective belief that circumstances existed that necessitated his use of force against the Guardian Angels. The reasonableness of a defendant's belief that force was necessary is a question of fact and depends upon the unique facts and circumstances of each case. *People v. Sawyer*, 115 Ill. 2d 184, 193 (1986); *People v. Rodriguez*, 336 Ill. App. 3d 1, 15 (2002).

¶ 37    At trial, the trier of fact heard differing accounts of the altercation that took place between defendant and the Guardian Angels. Chaudhary testified that Gunn struck him in the head multiple times with a gun and took his phone. Fuentes testified that he witnessed Gunn retrieve a black gun from his waist, strike a passenger in the head with the butt of the gun and grab the passenger's phone. Gunn ran out of the train and Fuentes alerted the other Guardian Angels of a "code red."

The Guardian Angels eventually subdued Gunn and attempted to hold him on the platform. Given this, the record shows that Gunn was escaping a forcible felony, the armed robbery of Chaudhary, and the Guardian Angels attempted to secure him to prevent the commission of the felony.

¶ 38    Defendant does not contest that he was informed Gunn robbed someone prior to attacking the four Guardian Angels. See 720 ILCS 5/7-4 (West 2012); 720 ILCS 5/2-8 (West 2012); *People v. Smith*, 242 Ill. App. 3d 344, 349 (1993) (A person who is escaping a forcible felony may not use force in his defense). Rather, he argues that he thought Gunn was being "gay bashed," and the application of a chokehold by Rodriguez demonstrated he was capable of great bodily harm. In finding defendant guilty, the trial court did not find his testimony credible. As mentioned, this court will not substitute our judgment for that of trial court on issues of credibility or the weight of the evidence. *Brown*, 2013 IL 114196, ¶ 48.  This is especially so where, as here, defendant's credibility was impeached with his prior convictions and his prior inconsistent statements to a detective.

¶ 39    As already noted, defendant does not dispute that he was informed that Gunn had robbed someone prior to attacking the Guardian Angels, who were wearing their uniforms. Defendant testified that he did not believe the Guardian Angels that Gunn had robbed someone. On cross-examination, he admitted that he did not know whether Gunn had robbed someone. Defendant stated that after seeing Gunn in a headlock he attempted to help him. As he did so, another man placed defendant in a chokehold. Defendant bit the man's arm and was then hit in the back of the head, maced and placed into another chokehold. Defendant testified he had a hard time breathing, was getting dizzy and was on the edge of the platform. Then he pulled out a knife and stabbed a man. Rodriguez on the other hand testified that he told defendant to "back off" and that Gunn was

armed and had just robbed someone. Defendant then pushed Rodriguez, jumped on Fuentes, and started hitting him in the head. Rodriguez then placed defendant in a chokehold. Defendant broke free from the hold, retrieved a knife and stabbed Rodriguez before stabbing the other Guardian Angels. On cross examination, defendant admitted that he did not attempt to contact the authorities or seek medical attention after the incident. In rebuttal, Detective Li testified that in his interview of defendant, defendant never said he was asleep on the train or thought the incident was related to "gay bashing." Instead, defendant saw Gunn get up and refused to elaborate on what happened next. Defendant did not raise being lightheaded or fearing falling towards an oncoming train.

¶ 40    Given this differing version of events, the trier of fact was required to evaluate the credibility of the witnesses and determine which version of the events was more credible in order to determine the reasonableness of defendant's belief that his use of force was necessary. After viewing the evidence in the light most favorable to the State, we find that a rational trier of fact could have concluded beyond a reasonable doubt that defendant's belief that the circumstances present justified his use of force was unreasonable.

¶ 41    In reaching this conclusion, we note that the trier of fact is not obligated to accept a defendant's claim that he acted in self-defense where the trier of fact hears conflicting accounts of the events that led to the victim's injury. See, e.g. *People v. Flemming,* 2015 IL App (1st) 111925-B ¶¶ 57-58 (rejecting the defendant's argument that his conviction for aggravated battery should be reversed because he acted in self-defense where the court heard conflicting version of the events that precipitated the stabbing, found the defendant's version less credible and concluded that the defendant's belief that he was justified in using deadly force was not reasonable).

¶ 42    For the foregoing reasons, we affirm the judgment of the circuit court of Cook County.

¶ 43    Affirmed.