# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

**People v. Davis, 2012 IL App (2d) 100934**

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. MARKIEL L. DAVIS, Defendant-Appellant. |
| District & No. | Second District<br>Docket No. 2-10-0934 |
| Filed | March 29, 2012 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | The statute creating the offense of criminal trespass to a residence does not require the State to prove that defendant knew he lacked authority to enter the residence; therefore, defendant's conviction for criminal trespass to a residence arising from his entry into a residence while others were present was affirmed, despite the State's failure to prove that he knew he lacked authority to enter the residence. |
| Decision Under Review | Appeal from the Circuit Court of Lake County, No. 09-CF-3656; the Hon. Daniel B. Shanes, Judge, presiding. |
| Judgment | Affirmed. |

Counsel on
Appeal

Thomas A. Lilien and Paul Alexander Rogers, both of State Appellate Defender's Office, of Elgin, for appellant.

Michael J. Waller, State's Attorney, of Waukegan (Lawrence M. Bauer and Victoria E. Jozef, both of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

Panel

JUSTICE HUDSON delivered the judgment of the court, with opinion.
Presiding Justice Jorgensen and Justice Zenoff concurred in the judgment and opinion.

## OPINION

¶ 1 Following a jury trial, defendant, Markiel L. Davis, was convicted of criminal trespass to a residence (720 ILCS 5/19-4(a)(2) (West 2008)) and sentenced to 32 months' imprisonment. Defendant appeals, arguing that the State failed to prove beyond a reasonable doubt that he knew that he lacked authority to enter the residence. For the reasons that follow, we affirm.

¶ 2                                    BACKGROUND

¶ 3 At the jury trial, Xiomera Hernandez Martinez gave the following testimony. She had worked as a housekeeper in the home of Robert Semrad for three years. Around 11 a.m. on September 10, 2009, she was cleaning the kitchen of the Semrad home when defendant entered the house through the kitchen door. Martinez had never seen defendant before. After entering the house, defendant took off his shoes. Martinez asked defendant who he was, and defendant responded, "What's up?" Defendant then proceeded to the second floor of the house, after which he went to the basement. He continued to walk around the house for approximately 20 to 30 minutes. Martinez did not see defendant take anything from the house.

¶ 4 James Krause testified as follows. On September 10, 2009, he was working as a drapery installer at the Semrad residence. While in the dining room taking measurements, Krause observed a man "walking very exaggeratedly, slowly and looking around as though he were in a museum or something, but walking really slow." After Krause finished measuring in the dining room, he located Daniel Rangelov, an employee of Semrad, to show him the other rooms that needed to be measured. While heading to the master bedroom with Rangelov, Krause observed the same man walking slowly up the stairs from the lower level of the house. Krause did not see the man attempting to hide, carrying anything, or doing anything

other than walking very slowly around the house.

¶ 5    Semrad gave the following testimony. He lived in a large house in Highland Park, Illinois. The house was located on a street with approximately 25 houses, but his house was rather secluded, as it was on a cul-de-sac and backed up to a ravine. His house was one of the largest houses on the street. On the morning of September 10, 2009, he and his wife accompanied their daughter to the nearby elementary school. When they arrived home at approximately 11:30 a.m., they were met by their nanny, who told them that there was a strange, unknown man in the house. Semrad ran into the house to make sure everyone was okay. The man was no longer there. Semrad spoke to Rangelov about what happened and then called the police. Semrad did not know defendant and never gave defendant permission to be in the residence.

¶ 6    Rangelov testified as follows. He had worked for Semrad since April 2009. His office was located in the Semrad residence. On the morning of September 10, 2009, he let Krause into the house to take measurements for draperies. After Krause completed the dining room measurements, he asked Rangelov to show him the master bedroom. As Rangelov was taking Krause to the master bedroom, he saw defendant in the hallway by the stairs. He did not know defendant and did not believe that he belonged in the house. Rangelov had not given defendant permission to be in the house. After showing Krause the master bedroom, Rangelov ran downstairs to ask defendant what he was doing in the house. As he got downstairs, Rangelov heard the door by the garage slam. Rangelov opened the door and saw defendant walking down the driveway. Rangelov asked defendant who he was looking for, and defendant turned around and took two steps back toward the house. Defendant did not say anything and then turned around again and got into his car. Rangelov then had a conversation with Martinez about defendant. After talking to Martinez, Rangelov ran to his office to get his camera. He then ran to the laundry room and videotaped defendant's vehicle from the window, after which he called Semrad to report what happened.

¶ 7    Detective Scott Fishman of the Highland Park police department gave the following testimony. On September 10, 2009, he was called to investigate the presence of an unknown man at the Semrad residence. Fishman ran the license plate of the vehicle in Rangelov's video and learned that the vehicle was registered to defendant. Fishman prepared a photo lineup that included a picture of defendant. Martinez and Rangelov both identified defendant in the lineup as the man whom they saw in the Semrad residence.

¶ 8    The jury found defendant guilty, and the trial court sentenced defendant to 32 months' imprisonment. Defendant then filed this timely appeal.

¶ 9                                    ANALYSIS

¶ 10    On appeal, defendant contends that the State failed to prove him guilty beyond a reasonable doubt, because it failed to prove that he knew he lacked authority to enter the Semrad residence. We conclude that it was unnecessary for the State to prove that defendant had knowledge of his lack of authority to enter the residence.

¶ 11    A defendant's conviction will not be set aside unless the evidence is so improbable or unsatisfactory that it creates a reasonable doubt of the defendant's guilt. *People v. Collins*,

106 Ill. 2d 237, 261 (1985). It is not the function of this court to retry the defendant. *Collins*, 106 Ill. 2d at 261. Rather, " 'the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " (Emphasis in original.) *Collins*, 106 Ill. 2d at 261 (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). The trier of fact must assess the credibility of the witnesses and the weight of their testimony, resolve conflicts in the evidence, and draw reasonable inferences from that evidence, and this court will not substitute its judgment for that of the trier of fact on these matters. *People v. Ortiz*, 196 Ill. 2d 236, 259 (2001).

¶ 12        Section 19-4(a)(2) of the Criminal Code of 1961 (Code) (720 ILCS 5/19-4(a)(2) (West 2008)) provides:

> "A person commits the offense of criminal trespass to a residence when, without authority, he or she knowingly enters the residence of another and knows or has reason to know that one or more persons is present or he or she knowingly enters the residence of another and remains after he or she knows or has reason to know that one or more persons is present."

Although defendant acknowledges that the statute does not expressly provide that a defendant must know that he or she lacked authority to enter the residence, he nevertheless argues that the State was required to prove such knowledge. No court of review in Illinois has had reason to decide this issue, as every time it has been raised, the court has found that, even assuming that the statute requires the State to prove that the defendant knew he lacked authority to enter the residence, sufficient evidence was presented that the defendant knew he lacked authority to enter. See *People v. Long*, 283 Ill. App. 3d 224, 226-27 (1996); *People v. Brown*, 150 Ill. App. 3d 535, 541 (1986).

¶ 13        We are compelled to decide the issue, however, because there was insufficient evidence to prove beyond a reasonable doubt that defendant knew he lacked authority to enter the Semrad residence. The evidence presented demonstrated that defendant entered the Semrad residence in the middle of the day with other people present, took off his shoes, spoke with Martinez, and then proceeded to walk freely around the house for a significant period of time. No evidence was presented that defendant forced his way into the residence or that he tried to conceal his presence once inside. He did, however, refuse to speak with Rangelov, when his presence was questioned. Even viewing the evidence in the light most favorable to the State, there was not sufficient evidence presented to conclude that defendant knew he lacked authority to enter the residence. The State's argument that it presented sufficient evidence that defendant knew he lacked authority to enter focuses on the evidence demonstrating that defendant lacked authority and offers insufficient support for the contention that defendant knew he lacked authority.

¶ 14        As we cannot conclude that the State provided sufficient evidence to prove that defendant knew he lacked authority to enter the residence, we must decide whether the State was required to do so in the first place. The primary goal in statutory construction is to ascertain and give effect to the intent of the legislature. *People v. Pullen*, 192 Ill. 2d 36, 42 (2000). In doing so, we must assume that the legislature did not intend an absurd or unjust result.

*Pullen*, 192 Ill. 2d at 42. The first step is to examine the language of the statute–"the surest and most reliable indicator of legislative intent." *Pullen*, 192 Ill. 2d at 42. If the statute does not provide a definition indicating a contrary legislative intent, words in a statute are given their ordinary and commonly understood meanings. *People v. Liberman*, 228 Ill. App. 3d 639, 648 (1992). Where the language is clear, the statute may not be revised to include exceptions, limitations, or conditions that the legislature did not express. *People v. Goins*, 119 Ill. 2d 259, 265 (1988).

¶ 15 The language of section 19-4(a)(2) is exceptionally clear. By using the word "knowingly" directly before "enters the residence of another," the legislature made apparent its intent to require the entry to be knowing. Similarly, the legislature specified that the State must prove that the defendant "knows or has reason to know that one or more persons is present." The legislature did not, however, place any words before or around "without authority" that would indicate that the legislature intended that the defendant's lack of authority be knowing. "When the legislature uses certain language in one part of a statute and different language in another, we may assume different meanings were intended." *People v. Hudson*, 228 Ill. 2d 181, 193 (2008). By not specifically requiring that a defendant knew that he or she lacked authority, when it had specifically required a defendant's knowledge of two other elements, the legislature made clear its intent that the "without authority" element need not be knowing. See *Hudson*, 228 Ill. 2d at 193 (concluding that where the legislature had used "bodily harm" in other portions of the statute, its use of "any injury" in another portion of the statute indicated the legislature's intent to encompass injuries beyond the physical).

¶ 16 Defendant contends that we should infer that a mental state–specifically, knowledge–applies to the "without authority" element pursuant to sections 4-3(b) and 4-9 of the Code (720 ILCS 5/4-3(b), 4-9 (West 2008)). Section 4-3(b) provides in relevant part that "[i]f the statute does not prescribe a particular mental state applicable to an element of an offense (other than an offense which involves absolute liability), any mental state defined in Sections 4-4 [intent], 4-5 [knowledge] or 4-6 [recklessness] is applicable." 720 ILCS 5/4-3(b) (West 2008). Section 4-9 provides:

"A person may be guilty of an offense without having, as to each element thereof, one of the mental states described in Sections 4-4 through 4-7 if the offense is a misdemeanor which is not punishable by incarceration or by a fine exceeding $500, or the statute defining the offense clearly indicates a legislative purpose to impose absolute liability for the conduct described." 720 ILCS 5/4-9 (West 2008).

According to defendant, these provisions, when read together, require us to infer that a defendant must have known that he or she lacked authority, because not doing so would be to impose absolute liability for the "without authority" element when the legislature did not clearly indicate that it intended to impose absolute liability for that element.

¶ 17 We conclude that the legislature did clearly indicate that it intended to impose absolute liability with respect to the "without authority" element and, thus, it is unnecessary for us to infer that a mental state applies to that element. As discussed above, it is apparent that the legislature chose not to include a mental state for the "without authority" element, evidenced by the fact that the legislature specifically included the mental state of knowledge for the

other two elements. Had the legislature intended to apply a mental state to the "without authority" element, it certainly had the know-how and ability to do so. Yet, no such mental state was included. See *People v. Christopherson*, 377 Ill. App. 3d 752, 755 (2007). Short of including an explicit statement that no mental state applied to the "without authority" element, we can think of no other way that the legislature could have made it more clear that it intended absolute liability for the "without authority" element.

¶ 18    In sum, the language of the statute is clear in that it did not require the State to prove that defendant knew he lacked authority to enter the residence. Accordingly, the State's failure to prove that defendant knew he lacked authority does not warrant reversal.

¶ 19                                    CONCLUSION

¶ 20    For the foregoing reasons, the judgment of the circuit court of Lake County is affirmed.

¶ 21    Affirmed.