# Illinois Official Reports

## Appellate Court

---

### *People v. Gaines*, 2019 IL App (3d) 160494

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. KEITH GAINES, Defendant-Appellant. |
| District & No. | Third District<br>Docket No. 3-16-0494 |
| Filed | July 11, 2019 |
| Decision Under Review | Appeal from the Circuit Court of Will County, No. 15-CF-2835; the Hon. Edward A. Burmila Jr., Judge, presiding. |
| Judgment | Judgment vacated; cause remanded with directions. |
| Counsel on Appeal | James E. Chadd, Peter A. Carusona, and Amber Hopkins-Reed, of State Appellate Defender's Office, of Ottawa, for appellant.<br><br>James W. Glasgow, State's Attorney, of Joliet (Patrick Delfino, David J. Robinson, and Mark A. Austill, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |

JUSTICE McDADE delivered the judgment of the court, with opinion.
Justice Holdridge concurred in the judgment and opinion.
Presiding Justice Schmidt concurred in part and dissented in part, with opinion.


**OPINION**

¶ 1        Defendant Keith Gaines was charged with felony criminal damage to property (count I), felony criminal trespass to residence (count II), misdemeanor criminal damage to property (count III), misdemeanor domestic battery (count IV), and misdemeanor aggravated assault (count V). Gaines and the State entered into a plea agreement in which Gaines would plead guilty to counts III and IV, both misdemeanors and, in exchange, the State would nol-pros the remaining charges and recommend a sentence of 158 days in prison (to be offset by 158 days of time served), 24 months' probation, and anger management classes. At the guilty plea proceeding, Gaines pled guilty to counts III and IV, and the trial court unequivocally accepted the plea. Thereafter, the trial court asked defendant if he would like to make a statement. As defendant spoke, the trial judge cut him off mid-sentence, vacated his guilty plea, reinstated all his charges, and continued the case to trial. At trial, the court found defendant guilty of counts II and IV, not guilty of all remaining charges and, ultimately, sentenced defendant to 60 months' imprisonment and assessed various fines and costs. Defendant appealed. We reverse and vacate the trial court's judgment.

¶ 2                                      FACTS
¶ 3        Defendant Keith Gaines was charged by indictment with felony criminal damage to property (count I) (720 ILCS 5/21-1(a)(1) (West 2014)), felony criminal trespass to a residence (count II) (*id.* § 19-4(a)(2)), misdemeanor criminal damage to property (count III) (*id.* § 21-1(a)(1)), misdemeanor domestic battery (count IV) (*id.* § 12-3.2(a)(2)), and misdemeanor aggravated assault (count V) (*id.* § 12-2(c)(1)). Gaines and the State entered into a fully negotiated agreement in which Gaines would plead guilty to misdemeanor domestic battery and misdemeanor criminal damage to property and, in exchange, the State would dismiss the remaining charges and recommend a sentence of 158 days in prison reduced by 158 days already served, 24 months' probation, and anger management classes.

¶ 4        During the guilty plea proceeding, the following dialogue occurred:

"MS. RABENDA: Your Honor, as to Mr. Gaines, the State would be recommending if the defendant were to plead to an amended Domestic Battery, Class A Misdemeanor on Count IV and Criminal Damage to Property on Count III.

THE COURT: Are those all Class A Misdemeanors?

MS. REBENDA: Yes. 24 months of reporting probation, 158 days, day for day credit for time served, time considered served.

THE COURT: How many days was that, please?

MS. RABENDA: 158. I would make a motion to *nolle prosequi* all remaining counts and the defendant would attend an anger management program or provide proof of completion thereof.

THE COURT: Okay. If Mr. Dawson and Ms. Crawford, if you would just stand by for a minute.

Mr. Gaines, do you see that document? Is that your signature?

DEFENDANT GAINES: Yes, Sir.

THE COURT: Do you understand that by pleading guilty there isn't going to be a trial of any kind in this case. These are all Class A Misdemeanors, the maximum punishment is a fine of up to $2,500 and/or up to 364 days in the Will County Jail.

By pleading guilty you are giving away your right to remain silent by admitting to me that you committed these crimes. You are also giving away your right to a jury trial where 12 people would be selected randomly from the community to determine your guilt or innocence. Once you do that, that right is gone, it's gone forever and you can't get it back.

You heard the Assistant State's Attorney tell me there was a plea agreement in your case. Is what she told me your understanding of the agreement?

DEFENDANT GAINES: Yes, sir.

THE COURT: You understand I don't have to go along with that, that I can sentence you to anything that the law would allow once you plead guilty?

DEFENDANT GAINES: Yes, sir.

THE COURT: Brief statement of facts, Ms. Rabenda?

MS. RABENDA: Your Honor, one other admonishment. I believe that the defendant is on parole for residential burglary.

THE COURT: But you're reducing this to a misdemeanor, right?

MS. RABENDA: Correct.

THE COURT: Okay.

MS. RABENDA: Statement of facts. If called to testify, witnesses for the State would testify that officers met with Latoya [*sic*] Gaines who indicated that she had come home and discovered her son, being the defendant, in the house and that he was not welcome there. She ordered him to leave. He did not do so. She went upstairs and when she came back down he was still there. She asked him what he was doing. He grabbed her about the neck. She had difficulty breathing. She tried to call for her husband but the defendant grabbed and broke her phone.

The defendant ran outside and began to throw landscaping bricks at the house windows and screen door. The defendant's father came home and told the defendant to stop. The defendant threw bricks at him but missed. Damage was done to Lee Gaines' Chevrolet Silverado. Windows were broken on the house, the door and there were scratches on LaToya's [*sic*] neck.

THE COURT: And you're reducing these to misdemeanors?

MS. RABENDA: Yes, Your Honor. I have had a number of conversations with the named victims in this matter and that was part of their request.

THE COURT: Is that what happened, Mr. Gaines?

DEFENDANT GAINES: Not—no, but I don't want to be in here fighting it. I'd rather—

THE COURT: Okay. Well, let me ask you this. If you don't agree that that's what happened, do you think that's what the witnesses would say if they were here?

DEFENDANT GAINES: Yeah.

THE COURT: Show the Court finds that defendant's plea of guilty and his waiver of his right to remain silent and his waiver of his right to a jury trial to be knowing and intelligently entered into and executed in writing, accepted by the Court.

Prior criminal history?

MS. RABENDA: Your Honor, the defendant has a residential burglary from 2012 that he was given four years in [the Department of Corrections (DOC)]. He's on parole. I believe he has less than a week left on that parole. He has a DUI from 2013 that he received conditional discharge and a theft adjudication of a delinquent minor from 2011. It was a misdemeanor.

THE COURT: Is that accurate, Mr. Phillips?

MR. PHILLIPS: Yes, Judge.

THE COURT: Sir, you have the right to make a statement. Anything you say, I'll take it into account. If on the other hand you don't want to say anything, you don't have to. If you don't say anything I won't hold it against you. Is there anything you want to say?

DEFENDANT GAINES: I know this look bad—

THE COURT: I'm sorry, what did you say?

DEFENDANT GAINES: I want to say I know it sounds bad in the statement that was given, but if it was to go to trial no one would be coming to court. Or if they did they would say that—

THE COURT: Okay. The plea is rejected. The felonies are reinstated. What day do you want to set this for trial? I won't participate in any 402 conferences in this case.

As far as the material witnesses are concerned, we'll issue a notice to appear so that they can be entered into a material witness bond so that they will be here for the trial. I'll make sure that they're here so you won't have to worry about them not being here. We're going to set it for—

MR. PHILLIPS: Judge, I'm going to ask for two weeks for status.

THE COURT: Two weeks. Okay. That will be March the 24th, and that will be at 9:00 o'clock in this courtroom. But prepare those notices to appear so that the witnesses are here on the 24th, Ms. Rabenda."

¶ 5 Thereafter, the State filed a motion to include the 911 recording of the incident for which defendant is charged as direct evidence at trial. The State argued that the statements within the recording were admissible under the spontaneous declaration exception to the hearsay rule. Gaines objected to the motion, claiming that the admission was unnecessary because the witness was present and planned to testify. The court granted the motion, stating: "Well, I'm going to let it in [as a spontaneous declaration], but I'm going to take under advisement whether I'm going to consider it as direct evidence. And I will give my ruling on that when the defendant makes his motion for a directed verdict."

¶ 6 The case proceeded to a bench trial. On direct examination, LaTanya Gaines testified that Gaines was her son and that on December 24, 2015, Gaines "was—he had just officially moved

- 4 -

back home, like, within less than—it had to be less than a week, ten days." She stated that Gaines was previously living with her sister but Gaines always had his belongings at her and her husband's home. She was working on December 24, and when she came home, Gaines was at the residence. LaTanya and Gaines had plans to go shopping for gifts for the dogs. When asked what she did when she encountered Gaines, LaTanya stated she did not know. Before she called 911, she and Gaines "had words," but she did not remember "a lot of the details about what happened. I had been drinking, I know that much, it was the Holidays. I don't remember what led to calling 9-1-1." She did not call 911 and believed that her husband called 911 and handed her the phone. While she was on the phone, her husband and Gaines were arguing outside and throwing bricks at each other. LaTanya spoke to the police when they arrived but did not remember filling out a written statement. When asked if she remembers telling the police that her daughter was home, LaTanya stated that she did not remember seeing her daughter. When asked if she recalled telling the police that Gaines was not welcome in her home and that she had asked him to leave, LaTanya stated that she did not recall. She also did not recall telling the police that Gaines grabbed her by the neck and choked her. The next day, LaTanya observed that her screen door glass and a window were broken.

¶ 7 On cross-examination, LaTanya testified that she did not remember having words with Gaines and that she did not recall the events on December 24. She did not know who broke the windows. She did not see Gaines and her husband throwing things but "they were out there when the windows were being broke. I didn't actually see, like, who was throwing what, but had been out there and they were—and the windows were breaking."

¶ 8 Lee Gaines, Gaines's father, testified that when he arrived at this home after work on December 24, he entered the garage and heard Gaines and LaTanya "yelling and screaming." As Lee was by the service door of the garage, he asked Gaines and LaTanya "what's happening, what's going on." Gaines exited through the door, and Lee stated to Gaines "why don't you just leave cause you guys are steady arguing. Why don't you leave." Afterward, Lee testified that Gaines

> "disappeared for a minute. I went back in the house, tending to the wife and cleaning up glass, still trying to figure out what was going on. By this time, I guess, you know, I'm hearing the police alarms, you know, the sirens and everything and I'm standing at the door.
>
> That is when I see Keith at the corner. That's when we both outside when the police pulled up. I'm in the house sweeping up glass, just trying to comfort her. To find out what was happening. Once I told him to leave initially, he left. I don't know where he went. Maybe he just went to the corner where he was when the police came."

¶ 9 Lee stated that Gaines did not throw anything at him. When asked if he recalled telling police officers that Gaines had thrown bricks at him, Lee replied no. Lee did not know who broke the windows. Lee also saw damage to the driver's side window of his truck but did not know how the damage happened. Aside from Gaines's incarceration in DOC and his one-week stay at his aunt's house, Gaines had lived at Lee and LaTanya's house prior to December 24. In response to the trial court's question, Lee stated that Gaines was paroled from prison in 2015 but was not registered to live at Lee's residence.

¶ 10 Will County sheriff's deputy Robert Stanko testified that he was dispatched to 13658 South Jonesport Circle for a possible disturbance. When Stanko arrived at the scene, he saw Lee and Gaines yelling and screaming at each other. Lee was on his driveway, and Gaines was three

houses down on the street corner. Stanko detained Gaines and placed him in the squad car. Afterward, Stanko spoke with LaTanya who told him that when she arrived home, Gaines was inside visiting her daughter. Gaines "wasn't supposed to be there, that she was telling him to either leave or get away and he was staring at her in an intimidating manner where she thought he was going to strike her." She noticed that there were tables in front of the kitchen entryway. When she asked Gaines "what the f*** are you doing," he "grabbed her by the neck and began choking her."

¶ 11    Stanko observed LaTanya's neck and "saw red marks. It looked like long red marks around where somebody—their fingers would be around someone's neck, I guess—depression marks where a hand was." LaTanya stated that, after Gaines choked her, he left the residence with her cell phone and LaTanya locked the door. In response, Gaines began throwing bricks through the front windows and the front door. Stanko also spoke with Lee who told him that Gaines had grabbed bricks and threw them at the windows, the screen door, his truck window, and Lee himself. After his arrest, Gaines gave Stanko an address different from Lee and LaTanya's address. Defense counsel objected several times to Stanko's hearsay statements, but the court allowed the statements for impeachment purposes. The court admitted photographs of the broken windows into evidence.

¶ 12    The 911 dispatcher who communicated with LaTanya during the alleged incident authenticated the 911 audio recording, and it was played for the court. On the recording, LaTanya tells the dispatcher that "my son has gone crazy, he attacked me he tried to kill me, he took all the phone[s], he threw a brick through the front window." The dispatcher later asked LaTanya if Gaines had taken any medications or drugs recently, and LaTanya stated, "He doesn't live with me… He doesn't live with me. Marijuana is his drug of choice." LaTanya told the dispatcher that Gaines and her husband were outside. She then states, "he broke my car window." LaTanya later screams and states "he broke another window," "he just threw a brick through the front door," and "he's breaking more things out here."

¶ 13    Subsequently, the State again argued that the 911 recording was admissible because the statements were spontaneous declarations. Defense counsel countered that, although the beginning of the conversation between LaTanya and the dispatcher was spontaneous, the remaining portion of the recording did not qualify as an excited utterance because those statements were made in response to questions from the dispatcher. The court admitted the recording under the excited utterance exception to the hearsay rule, determining that the spontaneity of a statement is not destroyed when a 911 dispatcher asks multiple questions.

¶ 14    The trial court found Gaines guilty of misdemeanor domestic battery (count IV) and felony criminal trespass to a residence (count II) and not guilty of the remaining charges (counts I, III, and V), finding the State did not prove them beyond a reasonable doubt. The trial court determined that the testimony given by LaTanya and Lee was not credible and "purposeful falsehood." Relying on *People v. Davis*, 2012 IL App (2d) 100934, *People v. Brant*, 394 Ill. App. 3d 663 (2009), and *People v. Long*, 283 Ill. App. 3d 224 (1996), the court ruled that "the defendant was present in the residence when the mother came home, that at the moment that he attacked his mother, circumstantially his ability to remain in the house was terminated."

¶ 15    Gaines filed a motion for a new trial, arguing that the State failed to prove him guilty beyond a reasonable doubt and the court erred in admitting the 911 recording under the excited utterance exception to the hearsay rule. The court denied the motion, sentenced Gaines to 66 months' imprisonment, and assessed various fines and costs. Gaines filed a motion to

reconsider, and the court reduced Gaines's sentence to 60 months' imprisonment. The court noted that the misdemeanor domestic battery conviction merged with his sentence for criminal trespass to a residence. Gaines appealed.

¶ 16                                    ANALYSIS
¶ 17                           I. Sufficiency of the Evidence

¶ 18        Gaines claims that the State did not prove he was guilty beyond a reasonable doubt of criminal trespass to a residence because it did not show that Gaines "knowingly and without authority, remained within the residence of another." Gaines claims that the evidence shows that he entered into the house with innocent intent because, as LaTanya testified, they had planned to go Christmas shopping together for the family pets on the day of the incident. Furthermore, Gaines alleges that, even if this court finds that he did not have authority to be in the residence, he did not remain in the residence after the altercation with LaTanya. Gaines contends that the State cannot rely on Deputy Stanko's testimony as substantive evidence because his testimony was only admitted for impeachment purposes.

¶ 19        The State asserts that it proved Gaines guilty beyond a reasonable doubt of criminal trespass to a residence. Specifically, the State argues that the 911 recording, Deputy Stanko's testimony that LaTanya stated that Gaines did not have permission to be at the residence and that she was telling him to leave, and Deputy Stanko's testimony that Gaines had given him another address that was not his parents' address undermine LaTanya's testimony. Also, the State alleges that, because the trial court found that LaTanya's testimony was not credible, and in light of the other evidence, it had proven beyond a reasonable doubt that Gaines did not have authority to remain in the residence.

¶ 20        When a court reviews the sufficiency of the evidence, it must determine whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *People v. Phillips*, 215 Ill. 2d 554, 569-70 (2005). It is the province of the fact finder to assess the credibility of witnesses, weigh the evidence, decide what inferences it supports, and settle any conflicts in it. *People v. Ortiz*, 196 Ill. 2d 236, 259 (2001). The court neither retries the defendant nor imposes its judgment on that of the trier of fact. See *People v. Cunningham*, 212 Ill. 2d 274, 279-80 (2004).

¶ 21        Gaines's sufficiency challenge is directed against the conviction for criminal trespass to a residence under section 19-4(a)(2) of the Criminal Code of 2012 (Code) (720 ILCS 5/19-4(a)(2) (West 2014)). It states,

    "A person commits criminal trespass to a residence when, without authority, he or she knowingly enters the residence of another and knows or has reason to know that one or more persons is present or he or she knowingly enters the residence of another and remains in the residence after he or she knows or has reason to know that one or more persons is present." *Id.*

The fact in issue here is whether the State presented sufficient evidence to show beyond a reasonable doubt that Gaines *remained* at his parents' residence without authority. The Code does not define "authority." However, Illinois courts consistently refer to the source of the authority to enter as the consent or permission of a person having an ownership or possessory interest in the property. *Brant*, 394 Ill. App. 3d at 670. The parent has a superior interest in the

home and may withdraw an individual's permission to enter a residence. *People v. Banks*, 281 Ill. App. 3d 417, 421 (1996).

¶ 22 The evidence here is insufficient to prove that Gaines remained in his parents' home without authority. The only substantive evidence presented was LaTanya's testimony, Lee's testimony, and the 911 recording. The trial court did not find LaTanya's and Lee's testimony credible as many of their statements were contradicted by other evidence. Even if the trial court had found them credible, their testimony did not show that Gaines remained in their home once any right he had to be there had been revoked by his mother (without authority). For instance, LaTanya testified that Gaines was living in her home at the time of the incident and that she did not remember telling Gaines he had to leave her home and Lee testified that, while he was standing at the garage door, Gaines left the home when Lee told him to leave. Moreover, the 911 recording is devoid of evidence that Gaines remained in the residence or in the yard without authority. Also, Officer Stanko's testimony, which provided the strongest support for the State's case, was only admitted for impeachment purposes and, although his testimony discredited that of LaTanya, it could not be used affirmatively to show that Gaines remained in the residence without authority. *People v. Bradford*, 106 Ill. 2d 492, 499 (1985) ("The purpose of impeaching evidence is to destroy the credibility of a witness and not to establish the truth of the impeaching evidence."). Without any evidence to the contrary, we find that the State failed to prove Gaines remained in the residence after being told to leave and was therefore guilty beyond a reasonable doubt of criminal trespass to a residence. We vacate this conviction.

¶ 23                                    II. Double Jeopardy

¶ 24 Next, Gaines argues that the trial court's vacatur of his guilty plea and subsequent trial on all five counts charged in his indictment violated the double jeopardy clause of the United States Constitution and the Illinois Constitution (U.S. Const., amend. V; Ill. Const. 1970, art. I, § 10). We have determined above that the State failed to prove Gaines was guilty beyond a reasonable doubt of criminal trespass to a residence (count II); we now assess the impact, if any, of double jeopardy principles on the viability of his domestic battery conviction.

¶ 25 It is well established that jeopardy, in a guilty plea context, only attaches to those offenses to which defendant pleads guilty at a guilty plea hearing. *People v. Cabrera*, 402 Ill. App. 3d 440, 448 (2010) (citing *People v. Bellmyer*, 199 Ill. 2d 529, 538 (2002)). Here, jeopardy never attached to the nol-prossed charges (counts I, II, and V) at the guilty plea hearing because Gaines never pled guilty to those charges. Therefore, the subsequent trial on the previously nol-prossed charges did not constitute a double jeopardy violation.

¶ 26 Gaines argues that jeopardy attached to his guilty plea when the trial court accepted the plea. Gaines alleges that the vacatur was not a proper termination of his plea because his statement did not indicate that he wanted to vacate his guilty plea and there was no evidence that he did not enter his guilty plea intelligently, voluntarily, and knowingly. Even if the trial court had a proper basis for vacating Gaines's guilty plea, it did not comply with Illinois Supreme Court Rule 605(c)(2), (5) (eff. Oct. 1, 2001) in that it did not give Gaines an opportunity to file a written post-plea motion. Gaines asserts that, therefore, the subsequent trial subjected him to double jeopardy. Gaines contends that this issue was not preserved for review but asks this court to review the issue for second prong plain error.

¶ 27    The State argues that jeopardy does not attach to a guilty plea unless the trial court accepts the plea *and* imposes a sentence. It claims that, because the court had not yet imposed a sentence, it was free to vacate Gaines's guilty plea without double jeopardy consequences. It further contends that the court had a right to vacate the guilty plea because the evidence showed that Gaines had proclaimed his innocence when the trial court offered him an opportunity to make a statement during the plea proceedings. Thus, the State asserts that the trial court did not violate Gaines's rights under the double jeopardy clause. We consider the propriety of undertaking a plain error review.

¶ 28    "The plain-error rule bypasses normal forfeiture principles and allows a reviewing court to consider unpreserved claims of error in specific circumstances." *People v. Thompson*, 238 Ill. 2d 598, 613 (2010). A reviewing court may excuse a procedural default where plain error affecting a substantial right has occurred. *People v. Cervantes*, 2013 IL App (2d) 110191, ¶ 21. A double jeopardy violation is a substantial injustice and may be reviewed for plain error. *Id.* When reviewing a double jeopardy challenge for plain error, a court must first determine whether an error occurred and, if so, the court must consider (1) whether the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error, or (2) whether the error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence. *Thompson*, 238 Ill. 2d at 613.

¶ 29    Section 3-4(a) of the Code (720 ILCS 5/3-4(a) (West 2016)) codifies constitutional double jeopardy rules. It states in pertinent part:

"(a) A prosecution is barred if the defendant was formerly prosecuted for the same offense, based upon the same facts, if that former prosecution:
(1) ***
(2) ***
(3) was terminated improperly after *** a plea of guilty was accepted by the court." *Id.*

¶ 30    Subsection (a)(3) is applicable to this case, and as it implies and case law establishes, jeopardy attaches when a defendant's guilty plea is accepted by the court. *Cabrera*, 402 Ill. App. 3d at 447 ("There are three settings in which jeopardy may attach: *** (3) at a guilty plea hearing 'when the guilty plea is accepted by the trial court.' " (quoting *Bellmyer*, 199 Ill. 2d at 538)); 720 ILCS 5/3-4(a)(3) (West 2016). In this case, Gaines pled guilty to misdemeanor domestic battery and misdemeanor criminal damage to property,[1] and the trial court unequivocally accepted his guilty plea.

¶ 31    Notably, as the proceeding continued, the trial court asked Gaines if he would like to make a statement. As Gaines spoke, the trial judge cut him off mid-sentence, vacated his guilty plea, reinstated all his charges, and continued the case to trial. The court's actions create an issue as to whether it improperly terminated the guilty plea proceedings and subjected Gaines to reprosecution in violation of section 3-4(a)(3) and, ultimately, the double jeopardy clause.

¶ 32    In *Cabrera*, 402 Ill. App. 3d at 449, the First District interpreted section 3-4(a)(3) to mean the following:

---

[1]The trial court found Gaines not guilty on this second charge, and it is not part of this appeal.

"For purposes of barring reprosecution, section 3-4(a)(3) makes no distinction between a jury or bench trial that terminates improperly and a guilty plea hearing that terminates improperly. An improperly terminated guilty plea proceeding, 'after a plea of guilty was accepted by the court,' will bar a subsequent prosecution, no less so than if a jury or bench trial terminated improperly. [Citation.] Inversely stated, just as a jury or bench trial may terminate properly, allowing for a retrial when, for example, 'manifest necessity' compels such an outcome [citation], by implication, if the original guilty plea hearing is terminated properly under Illinois law, a successive prosecution is not barred under section 3-4(a)(3)."

In essence, a proper termination of a guilty plea hearing does not trigger a double jeopardy bar to subsequent prosecution. *Id.* at 450. However, reprosecution is barred if the trial court improperly terminated the guilty plea hearing. *Id.*

¶ 33　　We have found no express language, either in statute or case law, that tells us when a proceeding is terminated improperly after the trial court has accepted the defendant's guilty plea. However, we do know that there are situations where a trial court may, *sua sponte*, withdraw its acceptance of defendant's guilty plea and, therefore, properly terminate the guilty plea proceeding. In *People v. Hancasky*, 410 Ill. 148, 154-55 (1951), our supreme court stated:

"[W]e believe it follows that a court may set aside or withdraw a plea of guilty, on its own motion and without the consent of a defendant, in cases where the evidence shows that the defendant is insane, or under some similar disability, or *where the court has good reason to doubt the truth of the plea*, or where it is affirmatively shown that the plea of guilty was induced by some promise on the part of the State's Attorney or others in authority, or where it is obvious that a defendant has been misinformed as to his rights." (Emphasis added.)

¶ 34　　Citing *Hancasky*, the *Cabrera* court explained the concept of claim of innocence, interchanging it with the rule that the trial court may withdraw a guilty plea when it has good reason to doubt the truth of the plea. Specifically, the *Cabrera* court stated:

"[U]nder well-established Illinois case law, a circuit court has discretion to accept or reject a guilty plea where the defendant proclaims his innocence. A circuit court may set aside or withdraw a guilty plea on its own motion, that is without a defendant's consent, where the court has good reason to doubt the truth of the plea." *Cabrera*, 402 Ill. App. 3d at 451 (citing *Hancasky*, 410 Ill. at 154-55).

¶ 35　　Ultimately, the *Cabrera* court established that the trial court's withdrawal of Cabrera's guilty plea after it accepted the plea, and after Cabrera made a claim of innocence, properly terminated the proceeding. Specifically, it determined:

"Judge Holt did not improperly terminate the defendant's guilty plea hearing. Judge Holt's sound exercise of discretion to vacate the defendant's guilty plea and set the case for trial was not an event that terminated the jeopardy that attached upon the acceptance of the defendant's plea of guilty to armed robbery. Of course, because the subsequent bench trial was part of the same continuous prosecution, placing the defendant in jeopardy but once, the sentence imposed after the verdict following the bench trial did not subject the defendant to multiple punishments under the double jeopardy clause." *Id.* at 453.

¶ 36        By contrast, the facts of this case support a finding that defendant's prosecution on his plea of guilty was improperly terminated by the actions of the court. Gaines's constitutional right not to be placed twice in jeopardy for the same crime was violated when he was retried for the crime of domestic battery and misdemeanor criminal damage to property to which he had pled guilty pursuant to the fully negotiated plea agreement. These conclusions are based on the following specific facts.

¶ 37        At the plea hearing the trial court got all of the details of the written plea agreement on the record, ascertained that Gaines understood both those details and the waiver of his trial rights, and then said: "You understand that I don't have to go along with that, that I can sentence you to anything that the law would allow once you plead guilty?" Gaines responded, "Yes, sir." The court thus clarified for Gaines (as required by Illinois Supreme Court Rule 402(d)(3) (eff. July 1, 2012)) that even if he pled guilty, thereby fulfilling his part of the agreement, the judge was free to deviate from the State's part of the agreement regarding its sentencing recommendation. His probation was not assured.

¶ 38        The State then recited the factual basis, which included the following allegations of criminal trespass: "Latoya [*sic*] Gaines *** had come home and discovered her son, being the defendant, in the house and that he was not welcome there. She ordered him to leave. He did not do so." The court then asked the prosecutor, "And you're reducing these to misdemeanors?" The prosecutor responded in the affirmative and expressly justified the reduction by stating that it had been made at the specific request of the complaining witnesses—defendant's parents. Accepting that statement as true, it would not be unreasonable to infer from that fact that Gaines's parents might also have voiced to him an intent to not appear or testify against him at trial.

¶ 39        When the court had earlier asked defendant if the State's factual recitation was what happened, defendant responded, "Not—no, but I don't want to be in here fighting it. I'd rather —" The court then interrupted to say: "Okay. Well, let me ask you this. If you don't agree that that's what happened, do you think that's what the witnesses would say if they were here?" Defendant answered, "Yeah". Whereupon the court, *knowing defendant did not agree with all of the allegations in the State's factual basis*, stated: "Show that the Court finds that defendant's plea of guilty and his waiver of his right to remain silent and his waiver of his right to a jury trial to be knowing and intelligently entered into and executed in writing, *accepted by the court.*" (Emphasis added.)

¶ 40        Having unequivocally accepted the guilty plea, the court confirmed defendant's criminal history with the prosecutor and then said to defendant:

> "Sir, you have the right to make a statement. Anything you say, I'll take it into account. If on the other hand you don't want to say anything, you don't have to. If you don't say anything I won't hold it against you. Is there anything you want to say?"

¶ 41        Gaines was faced with a dilemma at that point. Did he remain silent and hope that the judge, who had possibly already hinted that he thought defendant might have received too good a deal, would honor the State's sentencing recommendation or did he try to explain what he believed to be inaccuracies in the State's recited factual basis in the hope of protecting the State's recommendation from judicial deviation? It appears from the beginning of his statement that he had chosen the latter option.

¶ 42        The defendant said: "I know this looks bad ***." There was a clarifying question from the judge and Gaines resumed. "I want to say I know it sounds bad in the statement that was given,

but if it was to go to trial no one would be coming to court. Or if they did they would say that—" At this point, mid-sentence, the court interrupted and, without making any effort to ascertain what defendant was trying to say or even what his remarks were in reference to, vacated the plea, reinstated the felonies, and forced the defendant to trial on all of the offenses with which he had previously been charged and that had been resolved favorably to him through the plea agreement.

¶ 43    Prior to being interrupted by the court, defendant had made no claim that he was innocent of the charges to which he had pled guilty nor was there a reasonable basis for an inference that he was making such a claim. Gaines began his statement with two references to the *optics* of the State's factual basis. That factual basis contained allegations that did indeed look and sound "bad," and some of them related to crimes with which he was no longer being charged and to which he was not pleading guilty. These included the previously quoted allegations of criminal trespass to a residence which were disputed by defendant. *Supra* ¶ 38. As to those specific allegations, we have found in this appeal that the State's inability to prove them at trial required reversal of the defendant's conviction for felony criminal trespass.

¶ 44    In circumstances where, as here, defendant has entered into a fully negotiated plea agreement admitting to the commission to two crimes and has orally admitted to the commission of those crimes in open court and where that agreement or confession has been accepted by the trial judge on the record in open court and where the trial court vacates the entire plea without a clear and unequivocal claim by defendant of innocence of the crimes to which he has pled guilty, jeopardy is terminated and the statute precludes defendant's trial for those crimes because such trial is a violation of his constitutional right not to be placed twice in jeopardy for the same offenses.

¶ 45    Because there is no evidence to show that the guilty plea proceeding terminated properly, we find that the trial court improperly terminated Gaines's plea hearing under section 3-4(a)(3) of the Code and, therefore, the subsequent trial constituted double jeopardy. Automatic reversal is required only when an error is deemed structural, and our supreme court equated the second prong of plain error review with structural error. *Thompson*, 238 Ill. 2d at 608. The United States Supreme Court recognizes an error as structural in very limited cases, including a complete denial of counsel, trial before a biased judge, racial discrimination in the selection of a grand jury, denial of self-representation at trial, denial of a public trial, and a defective reasonable doubt instruction. *Id.* at 609. However, second prong plain error is not restricted to the six types of structural errors recognized by the Supreme Court. *People v. Clark*, 2016 IL 118845, ¶ 25. In fact, the Illinois Supreme Court had previously found second prong plain error in issues outside the six types of structural error. See *In re Samantha V.*, 234 Ill. 2d 359, 378-79 (2009) (holding that the failure to apply the one-act, one-crime rule constituted second prong plain error); *People v. Walker*, 232 Ill. 2d 113, 131 (2009) (finding that the failure to exercise discretion in denying a request for continuance constituted second prong plain error). "An error is typically designated as structural only if it necessarily renders a criminal trial fundamentally unfair or an unreliable means of determining guilt or innocence." *Thompson*, 238 Ill. 2d at 609.

¶ 46    We find that a double jeopardy violation constitutes structural error. The double jeopardy clauses under both the Unites States Constitution and the Illinois Constitution establish a core constitutional principle, grounded in fairness and finality, that a defendant must not be subject to multiple prosecutions and punishments for a single offense and " ' "thereby subject[ed] ***

to embarrassment, expense and ordeal and compell[ed] *** to live in a continu[ed] state of anxiety and insecurity, as well as enhancing the possibility that even though innocent he may be found guilty." ' " *People v. Guillen*, 2014 IL App (2d) 131216, ¶ 22 (quoting *United States v. Wilson*, 420 U.S. 332, 343 (1975), quoting *Green v. United States*, 355 U.S. 184, 187-88 (1957)). The protections under the double jeopardy clause are so essential that our legislature codified the constitutional double jeopardy rules in section 3-4(a) of the Code. Furthermore, it is well established that a violation of double jeopardy is a substantial injustice warranting excusal of the procedural default. See *People v. Henry*, 204 Ill. 2d 267, 281 (2003); *Cervantes*, 2013 IL App (2d) 110191, ¶ 21; *People v. Howard*, 2014 IL App (1st) 122958, ¶ 9. Therefore, we find that the subsequent trial on Gaines's domestic battery charge constituted substantial injustice tantamount to second prong plain error and requires that we reverse Gaines's domestic battery conviction and the trial court's erroneous vacatur of Gaines's guilty plea.

¶ 47        In this process, we find that defendant was never actually convicted on his plea of guilty on counts III and IV because he was never sentenced on those charges. See *People v. Salem*, 2016 IL App (3d) 120390, ¶ 45 ("while a guilty plea is an admission of guilt, such an admission of guilt does not become a final judgment of conviction until the court imposes a sentence, either by agreed disposition or following a sentencing hearing"). Therefore, we hold that no conviction stands, and we remand the matter to the trial court with directions to vacate the mittimus and order Gaines's release.[2] We need not review the remaining issues addressed in Gaines's appellate brief because those issues pertain to alleged errors during the guilty plea proceedings and subsequent trial that we reverse on appeal.

¶ 48                                CONCLUSION
¶ 49        The judgment of the circuit court of Will County is vacated.

¶ 50        Judgment vacated; cause remanded with directions.

¶ 51        PRESIDING JUSTICE SCHMIDT, concurring in part and dissenting in part:
¶ 52        I agree with the majority that the evidence presented by the State was insufficient to sustain defendant's conviction for criminal trespass. However, I disagree with the findings that (1) the trial court erred in *sua sponte* vacating defendant's guilty plea, (2) protections against double jeopardy attached, and (3) defendant entered into a fully negotiated plea agreement. For these reasons I respectfully dissent.

¶ 53                        I. *Sua Sponte* Vacating Defendant's Guilty Plea
¶ 54        The majority engages in speculation to arrive at the conclusion defendant was not claiming innocence. See *supra* ¶¶ 38, 41-43. The majority also finds that since "there is no evidence to show that the guilty plea proceeding terminated properly," it was terminated improperly. *Supra*

---

[2]The Illinois DOC website states that Gaines is currently incarcerated on the criminal trespass to property conviction at issue in this appeal. It appears that his parole on an earlier conviction of residential burglary, which had a week to run at the time of the plea hearing, was revoked and he was reincarcerated to complete that term as well. His projected discharge date is May 13, 2019. See *People v. Felton*, 2019 IL App (3d) 150595, ¶ 80 (we may take judicial notice of the public records appearing on the Illinois DOC website).

- 13 -

¶ 45. The record indicates otherwise. Specifically, the record shows that after the State presented the factual basis for the plea, defendant told the court that is not "what happened" but stated he did not "want to be in here fighting it." Then, after initially accepting defendant's guilty plea, but before sentencing, defendant essentially informed the court that no witnesses would testify if his case went to trial and hinted that, if they did testify, their accounts of the incident would differ from the factual basis that the State presented and the court accepted. This was certainly sufficient to give the trial court " '*good reason to doubt the truth of the plea*' " (emphasis in original) (*supra* ¶ 33) and terminate the proceedings. See *Hancasky*, 410 Ill. at 155. I find no clear or obvious error in the trial court's *sua sponte* renouncement of defendant's guilty plea where the defendant did all but shout "I am innocent" during the proceedings. The lack of error obviates the need to conduct a plain-error analysis. Thus, I would find that the trial court did not abuse its discretion.

¶ 55                                    II. Double Jeopardy

¶ 56        Having decided that the trial court did not improperly terminate the guilty plea proceedings, it follows that, even if jeopardy did attach, the protections against double jeopardy were never triggered. *Guillen*, 2014 IL App (2d) 131216, ¶ 50 ("Even if jeopardy had attached during the plea proceeding, the defendant's [subsequent] prosecution *** would be barred only if jeopardy 'terminated improperly.' " (quoting 720 ILCS 5/3-4(a)(3) (West 2012))); 720 ILCS 5/3-4(a)(3) (West 2014) ("A prosecution is barred if the defendant was formerly prosecuted for the same offense, *** if that former prosecution *** was terminated improperly after *** a plea of guilty was accepted ***.").

¶ 57        Further, "[t]here are three settings in which jeopardy may attach: (1) at a jury trial when the jury is empaneled and sworn; (2) at a bench trial when the first witness is sworn and the court begins to hear evidence; and (3) at a guilty plea hearing 'when the guilty plea is *accepted* by the trial court.' " (Emphasis added.) *Cabrera*, 402 Ill. App. 3d at 447 (quoting *Bellmyer*, 199 Ill. 2d at 538). As of yet, neither the United States Supreme Court nor Illinois law has defined the exact point at which a trial court is deemed to accept a guilty plea " 'although it has assumed that jeopardy attaches at least by the time of *sentencing* on the plea.' " (Emphasis in original.) *Guillen*, 2014 IL App (2d) 131216, ¶ 27 (quoting *State v. Thomas*, 995 A.2d 65, 72 (Conn. 2010)).

¶ 58        The majority states the trial court "unequivocally accepted the plea." *Supra* ¶ 1. However, the plea was vacated before defendant was sentenced. The trial court made it clear to defendant that it could reject the State's sentencing recommendation. It would only seem logical that for a "fully negotiated" plea to be unequivocally accepted, the trial court would also need to accept the sentencing recommendation. Otherwise, any alleged acceptance would seem to be, at best, more equivocal in nature. I do not agree with the majority's determination that the trial court accepted the guilty plea thereby attaching jeopardy.

¶ 59        Even if jeopardy did attach as the majority concludes, I would have applied the concept of continuing jeopardy. The reviewing court in *Cabrera* applied the principle of continuing jeopardy to a guilty plea proceeding. *Cabrera*, 402 Ill. App. 3d at 449. In that case, the trial court initially accepted the defendant's guilty plea and even entered a judgment on its finding. *Id.* at 442. Prior to sentencing, however, the defendant informed the court that he was innocent of the charged offense and only pleaded guilty " 'because of [his] background.' " *Id.* Immediately thereafter, and over the defendant's objection, the court vacated the defendant's

- 14 -

guilty plea. *Id.* at 443. On appeal, the reviewing court rejected the defendant's contention that the trial court's act of vacating the defendant's guilty plea terminated jeopardy and triggered double jeopardy protection. *Id.* at 452-54. Rather, the court found that the trial judge exercised sound discretion in vacating the guilty plea upon the defendant's pronouncement of his innocence and, therefore, the jeopardy that attached upon the trial court's acceptance of the guilty plea did not terminate. *Id.* at 453. The court concluded, "[b]ecause the jeopardy that attached to the defendant's plea of guilty to armed robbery did not terminate, reprosecution of the same offense in the defendant's subsequent bench trial was not barred by double jeopardy" as it "was part of the same continuous prosecution, placing the defendant in jeopardy but once." *Id.* at 453-54.

¶ 60        Similarly here, the trial court's vacation of defendant's guilty plea before sentencing did not terminate any jeopardy that may have attached and did not prohibit the subsequent bench trial which was part of the same continuous prosecution.

¶ 61                            III. Partially Negotiated Plea Agreement

¶ 62        As an ancillary matter, defendant misrepresents the nature of his plea deal with the State. The majority indulges defendant by finding that his plea was fully negotiated. *Supra* ¶¶ 3, 36, 44. "As Justice Freeman correctly observed in his special concurrence in *People v. Linder*, 'not all "negotiated" pleas are the same.' " *People v. Lumzy*, 191 Ill. 2d 182, 185 (2000) (quoting *People v. Linder*, 186 Ill. 2d 67, 77 (1999) (Freeman, C.J., specially concurring)). Pleas that are partially negotiated "fall into two categories: 'negotiated as to charge' agreements involving no agreement as to sentence; and 'negotiated as to charge and/or sentence' agreements." *People v. Hunzicker*, 308 Ill. App. 3d 961, 964 (1999). A "negotiated as to charge and/or sentence" agreement entails a sentencing concession on the part of the State. See *id.*; see also Robert S. Hunter, Mark A. Schuering, & Joshua L. Jones, Trial Handbook for Illinois Lawyers, Criminal Sentencing, Enforcement of Plea Agreements § 25:3 (9th ed. 2018).

¶ 63        Contrary to defendant's repeated assertions, he did not enter into a fully negotiated plea agreement. Rather, the record shows that defendant entered into a *partially* negotiated plea agreement. In particular, the State agreed, in part, to *recommend* a particular sentence in exchange for defendant's guilty plea. However, before pleading guilty, the trial court expressly admonished defendant that it need not accept the State's sentence recommendation and that it could, in fact, sentence defendant to any sentence allowed by law. This fails to strike me as something one would consider "fully negotiated."

¶ 64        For the foregoing reasons I find that the trial court did not abuse its discretion in vacating defendant's guilty plea, protections against double jeopardy were never triggered, and the plea agreement was only partially negotiated. A fully negotiated plea would be when defendant and the State agree that defendant will plead guilty to X crime in exchange for a specified sentence, say five years. There the trial court's only options are to accept or reject the plea. Defendant knows exactly what sentence he will receive if the trial court accepts the plea.